# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.,**
**2012 IL App (1st) 112321**

---

| | |
|---|---|
| Appellate Court Caption | HOME STAR BANK AND FINANCIAL SERVICES, Guardian of the Estate of Edward Anderson, a Disabled Person, and DARBY THOMAS, Plaintiffs-Appellants, v. EMERGENCY CARE AND HEALTH ORGANIZATION, LTD., and MICHAEL T. MURPHY, Defendants-Appellees (Provena Hospitals, d/b/a Provena St. Mary's Hospital, a Corporation, Defendants). |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-2321 |
| Filed | December 21, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a negligence action against an emergency room physician who responded to a "code blue" for a hospital patient and attempted to intubate him, summary judgment was improperly entered for the physician on the ground that he was immune from liability under the Good Samaritan Act, notwithstanding the fact that no one was billed for the services provided, since the physician was paid to work in the emergency room and he was not providing his services "without fee" for purposes of the Act. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-1340; the Hon. Elizabeth M. Budzinski, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Keith A. Hebeisen, of Clifford Law Offices, of Chicago (Robert P. Sheridan, of counsel), for appellants.

Kevin J. Vedrine and Christopher J. Solfa, both of Cunningham, Meyer & Vedrine, PC, of Warrenville, for appellees.

Panel

JUSTICE PALMER delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Taylor concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiffs Darby Thomas and Home Star Bank & Financial Services, as guardian of the estate of Edward Anderson, a disabled person, filed suit against defendants Michael T. Murphy, O.D., and his employer, Emergency Care & Health Organization, Ltd. (ECHO), alleging Dr. Murphy was negligent in treating Anderson. The trial court granted summary judgment to defendants, finding Dr. Murphy immune from liability pursuant to section 25 of the Good Samaritan Act (Act) (745 ILCS 49/25 (West 2010)). Plaintiffs appeal, arguing the court erred in granting summary judgment to defendants as (1) there is a genuine issue of material fact regarding whether Dr. Murphy's conduct was in good faith; (2) the Good Samaritan Act should not apply to Dr. Murphy, a physician compensated to perform services for patients in a hospital; and (3) there is no other basis for granting summary judgment. We reverse and remand.

¶ 2                            BACKGROUND
¶ 3    On August 25, 2001, Dr. Murphy was working as an emergency physician in the emergency department at Provena St. Mary's Hospital (St. Mary's or hospital). During his shift, he responded to a "code blue" called for Anderson, a patient on another floor who Dr. Murphy had never met. Dr. Murphy attempted to intubate Anderson and otherwise respond to the situation. Anderson suffered permanent brain injury. Plaintiffs filed a negligence action against Dr. Murphy and ECHO, alleging Dr. Murphy's care and treatment of Anderson were the cause of Anderson's injuries.[1] Dr. Murphy denied the allegations.

¶ 4    Dr. Murphy filed a motion for summary judgment on plaintiffs' third amended complaint, asserting that section 25 of the Good Samaritan Act barred the negligence action against him. Section 25 of the Act provides:
       "Any person licensed under the Medical Practice Act of 1987 [(225 ILCS 60/1 *et seq.*

---

[1]Plaintiff also filed suit against assorted other defendants. Those cases were settled and dismissed and are not at issue here.

(West 2010))] or any person licensed to practice the treatment of human ailments in any other state or territory of the United States who, in good faith, provides emergency care without fee to a person, shall not, as a result of his or her acts or omissions, except willful or wanton misconduct on the part of the person, in providing the care, be liable for civil damages." 745 ILCS 49/25 (West 2010).

Dr. Murphy asserted he was immune from liability under the Act because he had provided emergency care to Anderson and no one was ever billed for that emergency care. Dr. Murphy also asserted his conduct in providing the care and treatment to Anderson met the standard of care applicable to a reasonably well-qualified or careful emergency room physician. ECHO subsequently joined in the motion.

¶ 5    Plaintiffs responded that the Good Samaritan Act did not immunize Dr. Murphy from liability for his services to Anderson. As relevant to this appeal, plaintiffs agreed Dr. Murphy provided emergency care to Anderson but asserted that, as a matter of law, he did not provide emergency care "without fee" as required by the Act. Plaintiffs argued that Dr. Murphy was not a "volunteer" providing emergency care "without fee" because, as the emergency physician working in the emergency room at St. Mary's, it was his job to respond to the code called for Anderson and he was paid hourly for his services at the hospital, which included responding to codes. Again as relevant to this appeal, plaintiffs argued, in the alternative, that there was a genuine issue of material fact regarding whether the failure to bill for Dr. Murphy's emergency care to Anderson was in "good faith."

¶ 6    Exhibits and discovery depositions were filed by both parties in support of their pleadings. The "exclusive emergency room services agreement" between ECHO and St. Mary's showed that, in exchange for a monthly stipend, ECHO agreed to provide physician services to staff the emergency room at St. Mary's 24 hours a day and 7 days a week. The agreement stated that "[t]he primary obligation of ECHO's physicians when in service at [St. Mary's] emergency room shall be to care for any and all patients presenting themselves for treatment at the emergency room." ECHO physicians would "not furnish follow-up care to emergency patients except on an emergency basis or when requested by the Chief Executive Officer or Executive Committee of the Medical Staff of [St. Mary's]." Physicians covered by the agreement were to discharge their duties in accordance with the bylaws, rules, regulations and policies of the hospital and its medical staff. ECHO would bill and collect fees directly from patients and/or third-party payors for the services of its emergency room physicians.

¶ 7    An "independent contractor agreement" between ECHO and Dr. Murphy provided that ECHO engaged Dr. Murphy to provide "emergency medical services" at St. Mary's. An attachment to the agreement described the "emergency medical services" as follows:

"The Physician shall provide such professional services ordinarily provided by emergency physicians in a hospital, including but not limited to the following:

Physician shall provide emergency medical care for the following classes of patients ***:

1. Emergency Department

* * *

2. Inpatient

Physician shall not provide any general or routine care of patients already hospitalized under the care of another physician.

However, in dire emergencies, [*i.e.*], cardiorespiratory (or impending) arrest, Physician may render service to any patient, as long as there is not an emergency department patient requiring his/her immediate presence, and only until the patient[']s personal physician has assumed ongoing care."

The agreement provided that Dr. Murphy would be paid hourly and the hourly fee would be the "sole amount" he would receive for his services. Dr. Murphy agreed to abide by and render emergency medical services in accordance with the bylaws, rules and regulations of the hospital and departmental policies and procedures, using his professional judgment.

¶ 8      A typed "Clinical Operations/Nursing" department policy titled "Code Blue and Cardiac Arrest Team" set out the "standardized response" for a patient suffering a cardiopulmonary arrest at St. Mary's. The policy provided that it affected assorted departments, including the emergency department, and identified "ER Physician" as a code blue team member with the duty to "[r]espond[ ] to all Code Blues in the hospital. Direct[ ] [the] Code Blue Team." A typed "Clinical Operations/Nursing" department policy titled "Power Outage Emergency Code Blue" directed that "[s]hould a Code Blue occur [during a power outage], the unit that has the emergency will send a runner to: *** [t]he E.R. for the physician."

¶ 9      It is uncontested that ECHO billed Anderson for services its physicians provided to him during a previous emergency room visit on August 22, 2001, but did not bill for Dr. Murphy's services in responding to the code blue on August 25. St. Mary's billed Anderson for supplies used during the code blue but not for any physician's services.

¶ 10      By deposition, Dr. Murphy testified that the emergency room physician on duty at St. Mary's was the physician who would be expected to respond to a code blue. He was the only emergency room physician working at St. Mary's on the night of Anderson's code blue. As soon as he was notified of the code, he went to Anderson's room. Dr. Murphy stated it was part of his job in the emergency room at St. Mary's to respond to a code. He had been involved in "a lot" of codes at St. Mary's.

¶ 11      Joseph Danna, M.D., the president and chief executive officer of ECHO, testified ECHO was an independent contractor for St. Mary's, with an exclusive contract with the hospital to provide emergency room physician services to the hospital. Only ECHO physicians staffed St. Mary's emergency department. Dr. Murphy was one of those physicians under an independent contractor agreement he had with ECHO.

¶ 12      Dr. Danna testified it was "not an inherent part of [Dr. Murphy's] work, of his job," to respond to code blues at the hospital but, "if there were a dire emergency somewhere in the hospital where there was no one else available to respond, we would respond in the manner a good Samaritan would respond to that dire emergency." Dr. Danna had no understanding with the hospital that ECHO's emergency physicians were part of the standard code blue response team. He considered his physicians one of many available resources and, without exception, they were "the last person" the hospital would call and would do so only if the private physician, cardiologist, pulmonologist, surgeon or anaesthesiologist did not "show

-4-

up." Dr. Danna assumed Dr. Murphy responded to the code called for Anderson because "he was available to" and no other doctor was available that night. He was aware that other emergency room physicians had responded to codes at the hospital in the past but felt they were not obligated to respond.

¶ 13    Dr. Danna testified he knew "very little" about the Good Samaritan Act but understood it to protect him if he were driving home and stopped to help at the scene of an accident or if he responded to a dire emergency at the hospital. He thought the Good Samaritan Act applied to emergency room physicians responding to emergencies outside the emergency room.

¶ 14    Dr. Danna explained that ECHO contracted with an outside company, Per-Se Technologies, to do the billing for any of ECHO physicians' services.[2] ECHO only billed for services its physicians provided in the emergency department. Dr. Danna testified that ECHO "never billed" when its emergency room physicians responded to codes outside the emergency department. He stated ECHO understood there would be "circumstances beyond anyone's control where a patient might need [them] because there was nowhere else to go." ECHO had never received payment for any services Dr. Murphy rendered to Anderson because it had never billed for those services. ECHO had sent no such bill; Dr. Murphy was not allowed to bill Anderson or any patient; and the hospital would never bill for the services of ECHO's doctors. Dr. Danna testified ECHO might decide not to charge a patient if the patient "was particularly unhappy with the emergency department care," such as where a patient waited hours to be seen and left because he was not happy. Typically the emergency room physician would have to make such a request.

¶ 15    Heather Cluver, the office manager for Echo Management and Consulting, an ECHO affiliated company, and Richard K. Mullin, founder of Abrix Emergency Billing Services, LLC, testified that Abrix did the billing for the services of ECHO's emergency room physicians from 1999 to 2003; it was up to ECHO whether to send a bill to a patient; and there were situations in which a physician would call Dr. Danna and request that a patient who had been seen in the emergency room not be billed.

¶ 16    Paula Jacobi, the president and chief executive officer of St. Mary's in 2001, testified that the exclusive emergency room service agreement with ECHO provided for overall compensation to ECHO for the services of its doctors and that the doctors were independent contractors and not employees of the hospital. There was no reference in the agreement to emergency room doctors responding to code blue calls. For the 20-plus years Jacobi had worked at the hospital, first as a nurse and then as an administrator, the emergency room doctors "were the one[s] responding to codes." Jacobi testified the agreement with ECHO did not address whether the doctors were to respond to code blues because she assumed the long-standing practice at St. Mary's that the emergency room physician on duty would respond to a code blue would continue. She considered responding to a code blue to be "part of [the ECHO emergency department physicians'] responsibilities" and stated a code blue

---

[2]In 2001, at the time of Anderson's code blue, Abrix Emergency Billing Services, LLC, did the billing for ECHO.

is an emergency.

¶ 17   Jacobi testified that if a patient used services in the emergency department, ECHO would bill for the services of its emergency department physicians and the hospital would bill for the facility charges, such as supplies and overhead. Jacobi testified that a code blue was a billable event for St. Mary's. The hospital had, therefore, billed for the drugs and equipment used in the resuscitation of Anderson during the code blue. The hospital was not involved in any billing by ECHO and Jacobi did not know whether ECHO billed for the services of its physicians during a code blue.

¶ 18   Jacobi testified that the "Clinical Operations/Nursing" department "Code Blue and Cardiac Arrest Team" policy, as it had for many years, stated that it was the responsibility of emergency room physicians to respond to code blue calls. She did not know whether there was anything else in writing that would inform a physician directly of the requirement that the emergency room doctors respond to codes. She clarified that it was up to the emergency room doctor to determine whether he should leave a patient he was treating in the emergency room to attend to a code, depending on which patient had the more emergent needs.

¶ 19   Nancy Frizzell, RN, was the nursing supervisor at St. Mary's on the night of Anderson's code blue. Frizzell testified it was part of her job to be part of a code team. When a code was "announced overhead," she would respond. She had responded to over 100 codes. She stated the "Code Blue and Cardiac Arrest Team" policy was a nursing policy but every employee of the hospital was expected to follow it. It was Frizzell's understanding and experience that "during the night the ER physician normally comes to codes"; the emergency room doctor would "drop" what he was doing in the emergency room to respond to a code; and, even when physicians on the unit responded to a code, the emergency room doctor would still come "when [he] can."

¶ 20   Kenneth Johnston, M.D., a laryngologist, testified that Anderson was his patient. In the early morning of August 25, Dr. Johnston received a call at home from the hospital. He was told Anderson was having serious respiratory problems and Dr. Murphy, the emergency room doctor, was trying to intubate him. It was Dr. Johnston's understanding that an "in-house emergency room physician" was available 24 hours a day at the hospital and would respond to an emergency such as a code.

¶ 21   Eunice Riemer, a certified registered nurse anesthetist at St. Mary's, attended the code blue called for Anderson. She testified she was not told why she was called to the code but assumed it was because "the emergency physician could not access the airway so requested help from someone else" because this was "the standard in the hospital." Riemer had worked at St. Mary's since 1994 and it was her understanding that "when code blues were called that the emergency room physician would respond." She testified that she assumed the emergency room physician was in charge of the code because "they're usually there first, and then they call us."

¶ 22   On May 8, 2009, following a hearing, the trial court granted summary judgment to both Dr. Murphy and ECHO. The court found no evidence that ECHO ever billed Anderson or his insurer for Dr. Murphy's services or that the decision not to bill was done in bad faith. It held that Dr. Murphy's actions were, therefore, immune under the Good Samaritan Act.

-6-

¶ 23    The court gave plaintiffs leave to file an amended complaint in order to allege wilful and wanton misconduct. Plaintiffs filed fourth and fifth amended complaints, alleging wilful and wanton misconduct. Plaintiffs moved for a Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)) finding with respect to the order of summary judgment, asserting Dr. Murphy and ECHO were the only remaining defendants and the facts underlying the wilful and wanton counts were the same as those underlying the dismissal of the negligence counts under the Good Samaritan Act. The court granted the motion on August 12, 2011, finding no just reason to delay the appeal or enforcement of the order. Plaintiffs timely appealed on August 15, 2011.

¶ 24                                                    ANALYSIS

¶ 25    Plaintiffs argue summary judgment should be reversed as (1) a genuine issue of material fact exists regarding whether Dr. Murphy's conduct in failing to bill for his emergency care of Anderson was in good faith; (2) the Good Samaritan Act does not apply to people such as Dr. Murphy who are hired and paid to work in hospitals; and (3) there is no merit to Dr. Murphy's alternate basis for summary judgment that, as a matter of law, he did not deviate from the standard of care.

¶ 26    A motion for summary judgment is a drastic means of disposing of litigation and should be "granted only when 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " (Internal quotation marks omitted.) *Axen v. Ockerlund Construction Co.*, 281 Ill. App. 3d 224, 229 (1996) (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)). The purpose of summary judgment is not to try a question of fact but to determine whether one exists or if reasonable people could draw different inferences from the undisputed facts. *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 462 (2003); *Wood v. National Liability & Fire Insurance Co.*, 324 Ill. App. 3d 583, 585 (2001). When ruling on a motion for summary judgment, we construe the pleadings, depositions, admissions and affidavits strictly against the moving party and liberally in favor of the respondent. *Gauthier v. Westfall*, 266 Ill. App. 3d 213, 219 (1994). We review the trial court's entry of summary judgment *de novo*. *Golden Rule Insurance Co.*, 203 Ill. 2d at 462.

¶ 27                                            1. "Without Fee"

¶ 28    Plaintiffs first argue summary judgment should be reversed because a genuine issue of material fact exists regarding whether the failure to bill for Dr. Murphy's services to Anderson was in good faith. Since we agree with plaintiffs' second contention on appeal that the legislature did not intend section 25 of the Good Samaritan Act to apply to the facts of this case, we need not reach the question of whether Dr. Murphy acted in good faith when he did not bill for the emergency care he provided to Anderson.

¶ 29    Barring wilful and wanton misconduct, a physician who, "in good faith, provides emergency care without fee to a person," is immune from liability for that emergency care pursuant to section 25 of the Good Samaritan Act. 745 ILCS 49/25 (West 2010). State courts

have historically found that a physician claiming immunity under the Act must show that he or she in good faith (1) provided "emergency care" and (2) "did not charge a fee." *Estate of Heanue v. Edgcomb*, 355 Ill. App. 3d 645, 648 (2005). Courts have applied the Act to protect physicians who provided emergency care without fee in hospital and medical clinic settings. *Estate of Heanue*, 355 Ill. App. 3d 645 (in hospital); *Blanchard v. Murray*, 331 Ill. App. 3d 961 (2002) (in hospital); *Rivera v. Arana*, 322 Ill. App. 3d 641 (2001) (in medical center); *Johnson v. Matviuw*, 176 Ill. App. 3d 907 (1988) (in hospital).

¶ 30     The most recent state law development regarding the "without fee" requirement occurred in *Estate of Heanue*, 355 Ill. App. 3d 645, where the court held that unless a physician has billed specifically for the emergency care services, he has not charged "a fee" as contemplated by the legislature in section 25 of the Act. *Estate of Heanue*, 355 Ill. App. 3d at 650.

¶ 31     In *Heanue*, a physician provided emergency care to a patient when the patient's own doctor was not available. The physician was a member of the same surgical practice as the patient's own doctor and treated the patient at the request of the practice. He did not charge a fee for the emergency care he provided and claimed immunity under the Act. The plaintiffs asserted the physician was not immune because (1) as a member and compensated agent of the practice, he had a preexisting duty to treat a patient of the practice; and (2) he did not provide the emergency care "without fee" because the practice received thousands of dollars from the patient and, as a member of the practice, he benefitted financially from the practice's relationship with the patient.

¶ 32     The *Heanue* court found the first argument was foreclosed, because " 'a physician need not prove the absence of a preexisting duty to render aid to the patient in order to be immunized under section 25 of the Act.' " *Estate of Heanue*, 355 Ill. App. 3d at 648 (quoting *Neal v. Yang*, 352 Ill. App. 3d 820, 829 (2004)). With regard to the second argument, accepting for purposes of appeal that the physician benefitted financially from the practice's relationship with the patient, the court "nevertheless" concluded this financial relationship did "not constitute charging a fee for services as contemplated by the Act." *Estate of Heanue*, 355 Ill. App. 3d at 649.

¶ 33     The court found that the mere fact that the physician received some economic benefit from the relationship was not sufficient to remove him from the protection of the Act where he did not charge a fee specifically for the services at issue. *Estate of Heanue*, 355 Ill. App. 3d at 649-50. Looking to the plain and ordinary meaning of the word "fee," the court found definitions of the word "envision a very specific sort of relationship where the economic benefit is derived directly from the service performed. In other words, a fee is generated by and tied to the service performed." *Estate of Heanue*, 355 Ill. App. 3d at 649. As a matter of first impression, the court held "the legislature contemplated that section 25 would apply except where a doctor charges a fee specifically for the services at issue." *Estate of Heanue*, 355 Ill. App. 3d at 650.

¶ 34     In *Heanue*, the physician had not billed specifically for the emergency care he provided. The court, therefore, found the physician had not charged "a fee" as contemplated by the legislature and the question of whether the physician acquired some economic benefit from

the patient's relationship with the surgical group immaterial. *Estate of Heanue*, 355 Ill. App. 3d at 650. The court then remanded for a determination regarding whether the physician's decision not to charge a fee was made in good faith. *Estate of Heanue*, 355 Ill. App. 3d at 651. It explained: "[a]s it appears in the statute, 'good faith' modifies both 'provides emergency care' and 'without fee.' " *Estate of Heanue*, 355 Ill. App. 3d at 650. The record in the case allowed an inference that the reason no bill was sent for the emergency care was to trigger the Act, *i.e.*, it was done in bad faith. The court remanded so that the parties could address whether the decision not to bill was made in good faith. *Estate of Heanue*, 355 Ill. App. 3d at 651.

¶ 35    It is uncontested that Dr. Murphy in good faith provided emergency care to Anderson. It is also uncontested that: neither Anderson nor his insurer was billed for the emergency care provided by Dr. Murphy; neither Dr. Murphy nor ECHO was ever specifically compensated for that emergency care; although the hospital billed for the supplies used during the code blue, it did not bill and was not compensated for Dr. Murphy's emergency care during the code blue; pursuant to St. Mary's agreement with ECHO, only ECHO could bill for the services of its physicians; and ECHO did not bill for Dr. Murphy's emergency care to Anderson. Under *Heanue*, since no bill was sent for Dr. Murphy's emergency care services to Anderson, Dr. Murphy performed those services "without fee" as contemplated by section 25 of the Act. *Estate of Heanue*, 355 Ill. App. 3d at 649-50. We find *Heanue* unpersuasive. "We are not bound by the opinions of sister appellate courts." *Valent BioSciences Corp. v. Kim-C1, LLC*, 2011 IL App (1st) 102073, ¶ 24 n.4.

¶ 36    Our main objective in interpreting a statute is to determine and give effect to the intent of the legislature. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010). The most reliable indicator of the legislature's intent is the language of the statute, which must be given its plain and ordinary meaning. *Solon*, 236 Ill. 2d at 440. Clear and unambiguous statutory language must be applied as written, without resort to extrinsic aids of statutory construction and without reading into it exceptions, limitations or conditions that conflict with the expressed intent or that render any part of the statute meaningless or superfluous. *Solon*, 236 Ill. 2d at 440-41. We may consider the consequences that would result from construing the statute one way or the other, always presuming that the legislature did not intend absurd, inconvenient or unjust consequences. *Solon*, 236 Ill. 2d at 441. Only if a statute is ambiguous, if it is capable of being understood by reasonably well-informed persons in two or more different ways, will we consider extrinsic aids of construction to discern the legislative intent. *Solon*, 236 Ill. 2d at 440.

¶ 37    State court decisions have found the Act clear on its face and, therefore, have not examined the intent of the legislature in creating the Act. However, as explained persuasively by the United States District Court in *Henslee v. Provena Hospitals*, 373 F. Supp. 2d 802 (N.D. Ill. 2005), the Act *is* ambiguous.[3] *Henslee*, 373 F. Supp. 2d at 812. The Act does not

---

[3]We recognize that federal district court and subsequent Seventh Circuit rulings are not binding on us, but decisions of the lower federal courts may be persuasive authority. *Cooney v. Rossiter*, 2012 IL App (1st) 102129, ¶ 30.

define "without fee" and, as did the court in *Henslee*, we respectfully disagree with previous Illinois appellate courts that have found the phrase to be clear and unambiguous. *Henslee*, 373 F. Supp. 2d at 812.

¶ 38    "Fee" is undefined in the statute. Therefore, we must give it its ordinary and properly understood meaning. *Johnson v. Matviuw*, 176 Ill. App. 3d 907, 917 (1988). But "fee" has more than one meaning. It does not only encompass a situation where a patient is billed for the specific services a physician provides, as *Heanue* appears to hold. *Henslee*, 373 F. Supp. 2d at 809. If this were its sole meaning, then if a doctor or hospital neglected to send the patient a bill itemizing the doctor's specific emergency care, the Act would apply to the doctor, regardless of whether the doctor intended to bill for that care in the future or whether he received an indirect economic benefit from the patient's care. *Henslee*, 373 F. Supp. 2d at 809-10 (citing *Rivera*, 322 Ill. App. 3d at 648 (physician's intentions regarding future billing for emergency care he provided are irrelevant under the Act); *Heanue*, 355 Ill. App. 3d at 649-50 (only a specific fee or bill for emergency care provided triggers the Act)).

¶ 39    The word "fee" also encompasses a situation where a physician is paid.

> "[T]he typical fee transaction implicitly includes two steps: first, a party is billed; second, a professional is paid. Because the Good Samaritan Act does not restrict 'fee' to only one side of the typical fee transaction, this Court determines that the meaning of 'fee' is ambiguous. This Court proposes that a reasonable definition of 'fee' would be a situation in which *either* a doctor is paid for his services *or* the client pays a bill for those services. Under this interpretation of the Act, a 'fee' exists when a doctor is paid for the emergency services he renders." (Emphases in original.) *Henslee*, 373 F. Supp. 2d at 812.

Heanue's interpretation of "fee" captures only one side of a typical fee situation–the client being billed. *Henslee*, 373 F. Supp. 2d at 812. The Act does not restrict "fee" to only the one part of a fee transaction. "Fee" is capable of being understood in two different ways, the client being billed or the physician being paid, and is, therefore, ambiguous.

¶ 40    *Heanue*'s interpretation of the statute reinforces our determination that the term "without fee" is ambiguous. *Heanue* held "the legislature contemplated that section 25 would apply except where a doctor charges a fee specifically for the services at issue." *Estate of Heanue*, 355 Ill. App. 3d at 650. *Heanue* essentially adds language to the statute, limiting the statutory "without fee" by adding "specifically for the services at issue." If the Act were unambiguous, this additional language would not be necessary to effectuate the Act's statutory purpose.

¶ 41    Since "fee" as used in section 25 is ambiguous, we must follow the primary rule of statutory construction and give effect to the intent of the legislature. *Henslee*, 373 F. Supp. 2d at 812. *Heanue* and the other Illinois cases stray far from the intent of the Act. In 1965, in section 2a of the Medical Practice Act, the legislature originally provided immunity for a physician "who in good faith provides emergency care without fee at the scene of a motor vehicle accident or in case of a nuclear attack." Ill. Rev. Stat. 1965, ch. 91, ¶ 2a. In 1969, the legislature expanded coverage under section 2a by amending it to apply to emergency care provided "without fee to a victim of an accident at the scene of [the] accident or in the case of nuclear attack," thereby eliminating the requirement that the accident be vehicular. Pub. Act 76-1205 (eff. Sept. 11, 1969) (amending Ill. Rev. Stat. 1965, ch. 91, ¶ 2a).

¶ 42    In 1973, section 2a was expanded again when the legislature substituted "person" for "victim of an accident at the scene of the accident or in the case of nuclear attack." Pub. Act 78-385 (eff. Aug. 28, 1973) (amending Ill. Rev. Stat. 1971, ch. 91, ¶ 2a). This amendment also added "without prior notice of the illness or injury" so the section protected a physician "who, in good faith, and without prior notice of the illness or injury, provides emergency care without fee to a person." Pub. Act 78-385 (eff. Aug. 28, 1973) (amending Ill. Rev. Stat. 1971, ch. 91, ¶ 2a). During legislative debate on the amendment, Senator Shaffer explained:

> "This bill only gives a doctor a safeguard that [*sic*] if he comes upon an emergency situation if one of us falls down the stairs and rolls to the foot of the stairs here and a doctor treats us, and this is on the spot, *not in his doctor's office or in the hospital on the operating table*, that he has a little protection that if we have bad effects because he wasn't able to do the things he might do in a hospital, he would be somewhat protected." (Emphasis added.) 78th Ill. Gen. Assem., Senate Proceedings, May 22, 1973, at 49-50 (statements of Senator Shaffer).

¶ 43    In 1996, the legislature enacted the Good Samaritan Act (765 ILCS 49/1 *et seq.* (West 1996)). Pub. Act 89-607 (eff. Jan 1, 1997). The legislature also amended the Medical Practice Act to reflect that "[e]xemption from civil liability for emergency care is as provided in the Good Samaritan Act." 225 ILCS 60/30 (West 1996). Thus, former section 2a of the Medical Practice Act became section 25 of the Good Samaritan Act.

¶ 44    A final amendment in 1998 (Pub. Act 90-742, § 40 (eff. Aug. 13, 1998)) eliminated the requirement that the physician have no prior notice of the injury or illness, setting out the current version of the Act. 745 ILCS 49/25 (West 2010). During legislative debate on this amendment in 1996, Representative Lang asked Representative Winters whether it was his position "that the passage of th[e] [Act] would encourage good samaritans to do the right thing *on the streets of Illinois*, I suppose, without fear of repercussions in a court of law." (Emphasis added.) 89th Ill. Gen. Assem., House Proceedings, Mar. 25, 1996, at 100 (statements of Representative Lang). Representative Winters responded "that is exactly the point of the Bill." 89th Ill. Gen. Assem., House Proceedings, Mar. 25, 1996, at 100 (statements of Representative Winters).

¶ 45    The preamble to the Act states its legislative purpose is to codify the "numerous protections for the generous and compassionate acts of its citizens who *volunteer* their time and talents to help others." (Emphasis added.) 745 ILCS 49/2 (West 2010). It directs that "without limitation the provisions of this Act shall be liberally construed to encourage persons to *volunteer* their time and talents." (Emphasis added.) 745 ILCS 49/2 (West 2010).

¶ 46    One cannot be a volunteer if one is paid for the services provided, whether one is paid by the hour, the day, the month, the year or the patient visit. Dr. Murphy was not voluntarily present at the hospital. He was paid by the hour to be there. He received that pay in exchange for his services as emergency room physician and would be paid regardless of which or how many patients he saw or whether he saw those patients in the emergency room or on another floor. Dr. Murphy was compensated for the time he spent responding to the code blue called for Anderson. He did not provide that emergency care "without fee." We find that to hold otherwise would lead to an absurd result.

¶ 47        Further, *Heanue*'s one-sided definition of "fee" could result in a disparity of legal remedies between the affluent and the less-privileged. See Ben Bridges, Comments, *Curb Your Immunity: The Improper Expansion of Good Samaritan Protection in Illinois*, 34 S. Ill. U. L.J. 373, 391 (2010). If a hospital physician paid by the hour negligently provided emergency care to an affluent patient and the patient or the patient's insurer was billed for that care, the doctor would not be immune under the Act. Bridges, *supra*, at 391. If the same doctor provided negligent emergency care to an indigent uninsured patient and the hospital did not bill the patient because it would not be able to collect payment, the doctor would be immune under the Act. Bridges, *supra*, at 391. The affluent patient would be able to file a negligence action against the physician and the indigent patient would not. Bridges, *supra*, at 391. The physician could arguably provide substandard care to all poor, uninsured patients because those patients would have no legal recourse against him. Bridges, *supra*, at 391. The legislature cannot have intended such a result.

¶ 48        We agree with *Henslee* that a reasonable definition of "fee" in section 25 encompasses a situation "in which *either* a doctor is paid for his services *or* the client pays a bill for those services." (Emphases in original.) *Henslee*, 373 F. Supp. 2d at 812. "Under this interpretation of the Act, a 'fee' exists when a doctor is paid for the emergency services he renders." *Henslee*, 373 F. Supp. 2d at 812. "By using the term[ ] 'volunteer', the legislature seems to also contemplate the second part of a fee transaction–the doctor being paid. It follows that a doctor who is being paid to work at an emergency facility is neither a volunteer nor is he rendering 'emergency care without fee.' " *Henslee*, 373 F. Supp. 2d at 813.

¶ 49        As *Henslee* points out, billing for medical services is no longer a simple transaction between two parties. *Henslee*, 373 F. Supp. 2d at 813. It typically involves contracts between hospitals, doctors, practice groups and insurers. Doctors rarely bill patients directly and are seldom compensated directly by their patients, making it difficult to link a charge for services to a payment received from a patient. *Henslee*, 373 F. Supp. 2d at 814. Therefore, a definition of "fee" that includes both the doctor's compensation and the patient's eventual payment circumvents the possibility that doctors or their employers will attempt to "engineer immunity," such as by avoiding itemized billing or waiting to bill until threat of litigation has passed. *Henslee*, 373 F. Supp. 2d at 814.

¶ 50        "The Good Samaritan Act was meant to protect volunteers; it was never meant to be a shelter for practicing physicians who, acting in the scope of their employment, receive payment for their emergency services." *Henslee*, 373 F. Supp. 2d at 814. As the legislative history and preamble make clear, the Act is intended to protect physicians who step into the breach when coming upon an emergency, without aid of the usual equipment and services at their disposal and without thought of contractual duty or pay. The Act should not apply to physicians who provide emergency services in a hospital where they have been hired and paid to work, such as a staff member, an employee, an independent contractor or an on-call physician. These doctors are not providing their services "without fee."

¶ 51        Defendants' interpretation of the statute, taken together with modern billing practices and the facts that a majority of emergency room physicians are independent contractors or in a physicians' group, are compensated for their time and must respond to code blue calls as part of their job, leads to a situation where most code blue responses by physicians would be

immunized under the Act. This was not the intent of the Act. Nowhere in the legislative history of the Act is it ever stated that the intent of the Act was to immunize emergency room physicians who are paid for their time.

¶ 52　　We do not find that the Act can *never* apply in a hospital setting. The determination of whether emergency care was provided "without fee" is not dependent on the geography of where that care was provided. We merely state that, on these facts, as a matter of law, Dr. Murphy received "a fee" for his emergency care of Anderson and thus did not provide emergency care "without fee" as contemplated by the Act. Dr. Murphy is not immune from liability under the Good Samaritan Act. Summary judgment on this basis is reversed.

¶ 53　　　　　　　　　　　2. Deviation From the Standard of Care

¶ 54　　Plaintiffs lastly argue that there is no merit to Dr. Murphy's alternate basis for summary judgment, in which he asserted that, as a matter of law, he had not deviated from the standard of care. The trial court did not address this theory because it found Dr. Murphy immune from liability under the Act. We leave it to the trial court to address this alternate basis for summary judgment on remand.

¶ 55　　　　　　　　　　　　　　　CONCLUSION

¶ 56　　For the reasons stated above, we reverse and remand the decision of the trial court.

¶ 57　　Reversed and remanded.