# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234

---

| | |
|---|---|
| Caption in Supreme Court: | METROPOLITAN LIFE INSURANCE COMPANY *et al.*, Appellees, v. BRIAN HAMER, Director of the Illinois Department of Revenue, *et al.*, Appellants. |
| Docket No. | 114234 |
| Filed | June 20, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where statute provided that, during a six-week amnesty, "all taxes due" could be paid without interest or penalty, but that double interest would accrue on liabilities unpaid during that time, taxpayers then under federal audit for prior years without knowing how their liabilities would change were properly charged that double interest where, during the amnesty, they did not pay good-faith estimated taxes as provided by regulation, but paid their increased liabilities only when those became known after the amnesty expired. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. James C. Murray, Jr., Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment reversed. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Eric Truett and Sunil S. Bhave, Assistant Attorneys General, of Chicago, of counsel), for appellants.

John A. Biek, Andrea R. Dudding and Christopher D. Mickus, of Neal, Gerber & Eisenberg LLP, of Chicago, for appellees.

Marilyn A. Wethekam and Fred O. Marcus, of Horwood Marcus & Berk Chrtd., of Chicago, for *amicus curiae* Council on State Taxation.

Justices

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Justices Freeman, Thomas, and Theis concurred in the judgment and opinion.

Justice Burke dissented, with opinion, joined by Justice Karmeier.

Chief Justice Kilbride took no part in the decision.

## OPINION

¶ 1    In 2003, the Illinois General Assembly enacted the Tax Delinquency Amnesty Act (2003 Amnesty Act) (35 ILCS 745/10 (West 2004)), which established an amnesty program for all taxpayers owing any tax imposed by Illinois law. It further provided that, upon payment by a taxpayer of "all taxes due" for any taxable period between June 30, 1983, and July 1, 2002, the Department of Revenue (Department) would abate and not seek to collect any interest or penalties and would not seek civil or criminal prosecution of that taxpayer. The amnesty period extended from October 1, 2003, through November 17, 2003. Those taxpayers who failed to pay their unpaid tax liabilities within that period would be charged 200% interest. The Department promulgated regulations implementing an amnesty program, providing that a taxpayer participating in the amnesty program must pay its entire tax liability regardless of whether the liability was known to the Department or to the taxpayer. The regulations further provided that taxpayers who were unsure of their tax liability were to make a good-faith estimate of the liability and pay it during the amnesty period.

¶ 2    The Internal Revenue Service (IRS) audited the 1997, 1998, and 1999 federal income tax returns of plaintiffs, Metropolitan Life Insurance Company and Unitary Subsidiaries (collectively, MetLife). Following completion of the audit, MetLife filed its amended Illinois tax returns showing additional tax due. Because MetLife paid the additional taxes after the amnesty period expired, the Department assessed 200% interest. MetLife paid the taxes due under protest and filed an action disputing that it owed more than 100% interest and seeking an injunction to order defendant State Treasurer to refund the double interest charged. The circuit court of Cook County granted MetLife's motion for summary judgment. The appellate court affirmed, with one justice dissenting. 2012 IL App (1st) 110400. This court granted

defendants' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 3                                    BACKGROUND

¶ 4        MetLife timely filed its Illinois corporate income tax returns for the years 1998 and 1999 and paid the tax liability stated therein. On December 12, 2000, the IRS began a routine audit of MetLife's federal income tax returns. The audit was completed in July 2004, eight months after the expiration of the amnesty period. In May 2002, the Department commenced an audit of MetLife's 1998 and 1999 Illinois income tax returns. MetLife provided the auditor with the changes to its federal returns as a result of the federal audit (referred to as the federal change tax liability). Based upon MetLife's submissions, the Department determined that MetLife owed additional Illinois income tax. On May 8, 2008, the Department assessed a 200% interest penalty against MetLife with respect to the additional tax determined to be due. MetLife paid the penalty under protest.

¶ 5        In July 2008, MetLife filed its complaint for an injunction and for declaratory judgment under the State Officers and Employees Money Disposition Act (30 ILCS 230/1 *et seq.* (West 2010)). It sought a declaration that the Department was not entitled to assess double interest. MetLife conceded that it owed a 100% interest penalty. It sought a finding that application of the double interest penalty to its federal change tax liability violated its due process rights under the United States and Illinois constitutions. It further sought a preliminary injunction to prohibit the Department from transferring the double interest assessment money from the protest fund to the general revenue fund until the court entered a final judgment. The trial court granted the injunction. The Department filed a motion to dismiss the action and to dissolve the preliminary injunction. The trial court denied the motion.

¶ 6        MetLife filed a motion for summary judgment. The motion contained stipulated facts as follows. MetLife timely filed its Illinois corporate income tax returns for the tax years 1998 and 1999, and paid the tax liabilities reported in the returns. In December 2000, the IRS commenced an audit of MetLife's 1997, 1998, and 1999 federal income tax returns, which took more than 3½ years to complete. In May 2002, the Department began an audit of MetLife's 1998 and 1999 Illinois corporate income tax returns. On June 20, 2003, the Illinois legislature enacted the 2003 Amnesty Act. The amnesty period began October 1, 2003, and concluded on November 17, 2003. Under the 2003 Amnesty Act, a taxpayer who did not satisfy a tax liability that was eligible for amnesty by the conclusion of the amnesty period was subject to double interest on that unpaid tax liability. The federal audit of MetLife's returns was completed in July 2004. In or after August 2004, MetLife provided the final adjustments of the IRS to the Department's auditor in lieu of filing amended Illinois returns for the years in question. In December 2004, the auditor determined that MetLife owed additional Illinois income taxes for 1998 and 1999 as a result of the changes to its federal returns. MetLife paid the federal change tax liability during the course of the Department's audit. MetLife made its final payment in May 2007 at the conclusion of the audit. The Department's auditor informed MetLife that it would receive a separate bill for double interest on the back taxes pursuant to the provisions of the 2003 Amnesty Act. In July 2008, MetLife paid the double interest under protest and commenced this action.

¶ 7     In its motion for summary judgment, MetLife argued that its federal change tax liability was not eligible for amnesty because the 2003 Amnesty Act did not require a taxpayer to pay an unassessed, unagreed-upon tax liability subject to an ongoing federal audit. MetLife noted that the 2003 Amnesty Act applied to "all taxes due" from a taxpayer and it argued that phrase should refer to taxes assessed and due at the time of the amnesty application.

¶ 8     The circuit court granted MetLife's motion for summary judgment. The court concluded that the phrase "all taxes due" in the 2003 Amnesty Act referred to known tax liabilities. The 2003 Amnesty Act was intended by the legislature to provide a "carrot and stick" to encourage taxpayers to voluntarily pay their known tax liability. The court relied on dictionary definitions of "tax" and "due" in finding that "all taxes due" referred to a present obligation or a yet to be determined obligation. The court concluded that MetLife's obligation for taxes due for past years was not determined until August 2004, which was beyond the amnesty period.

¶ 9     The appellate court affirmed, with one justice dissenting. 2012 IL App (1st) 110400. The majority agreed with the circuit court that "all taxes due" meant those taxes that a taxpayer knew were due and owing during the amnesty period. Thus, because MetLife did not know it owed additional taxes until after the amnesty period had ended, it could not have participated in the amnesty program. *Id*. ¶ 16. The majority rejected the Department's reliance on section 601(a) of the Illinois Income Tax Act (Income Tax Act) (35 ILCS 5/601(a) (West 2010)), which provides that taxes for a taxable year become due when the tax return for that year is required to be filed. According to the majority, when MetLife filed its 1998 and 1999 income tax returns and paid the amount of the tax shown due on the returns, it paid the amount that was due. MetLife became liable for the additional taxes only after the expiration of the amnesty period. 2012 IL App (1st) 110400, ¶ 17. The majority similarly rejected the Department's reliance on its regulations promulgated in connection with the 2003 Amnesty Act, finding that it was illogical to require a taxpayer to pay a tax liability of which neither the taxpayer nor the Department was aware. The majority also found that the requirement in the regulations that taxpayers in MetLife's position make a good-faith estimate of their additional tax liability exceeded the legislative intent behind the 2003 Amnesty Act. *Id*. ¶¶ 23, 24.

¶ 10    Justice Hoffman dissented, concluding that the phrase "all taxes due" in the 2003 Amnesty Act means all taxes due on the date fixed for filing the taxpayer's return, without assessment, notice, or demand, and without regard to any extension of time for filing the return. Justice Hoffman found the statutory language to be clear and unambiguous and that a plain reading of section 601(a) of the Income Tax Act established that because MetLife did not pay all the taxes that were properly due when it filed its returns and it did not pay the additional amounts during the amnesty period, it was liable for double interest. *Id.* ¶ 37.

¶ 11                                    ANALYSIS

¶ 12    The 2003 Amnesty Act directed the Department to establish an amnesty program for all taxpayers owing any tax imposed by the laws of Illinois. The amnesty period ran from October 1, 2003, through November 17, 2003. The 2003 Amnesty Act provided:

"The amnesty program shall provide that, upon payment by a taxpayer of all taxes due from that taxpayer to the State of Illinois for any taxable period ending after June 30, 1983 and prior to July 1, 2002, the Department shall abate and not seek to collect any interest or penalties that may be applicable and the Department shall not seek civil or criminal prosecution for any taxpayer for the period of time for which amnesty has been granted to the taxpayer. Failure to pay all taxes due to the State for a taxable period shall invalidate any amnesty granted under this Act. Amnesty shall be granted only if all amnesty conditions are satisfied by the taxpayer." 35 ILCS 745/10 (West 2004).

¶ 13    Pursuant to the legislature's directive, the Department promulgated regulations (27 Ill. Reg. 15161 (emergency rule eff. Sept. 11, 2003)) establishing an amnesty program. It provided that to participate in the amnesty program, a taxpayer must pay the entire tax liability irrespective of whether that liability was known to the Department or to the taxpayer. 27 Ill. Reg. 15161, 15168. Taxpayers, including taxpayers under audit during the amnesty period, who were unsure of the exact amount of their tax liability were to make a good-faith estimate of the amount of the liability. 27 Ill. Reg. 15161, 15168-69.

¶ 14    In connection with enactment of the 2003 Amnesty Act, the legislature amended section 3-2 of the Uniform Penalty and Interest Act to provide that if a taxpayer had a tax liability that was eligible for amnesty under the 2003 Amnesty Act and failed to satisfy the tax liability during the amnesty period, the interest charged to the taxpayer would be imposed at a rate that was 200% of the rate that would otherwise be imposed. 35 ILCS 735/3-2(f) (West 2004).

¶ 15    The Income Tax Act provides that a taxpayer who is subject to a change in its tax liability due to a change in its federal tax return must notify the Department of the change in the form of an amended return not later than 120 days after the federal change has become final. 35 ILCS 5/506(b) (West 2010). Section 903 of that Act provides that the amount of tax shown to be due on a tax return shall be deemed assessed on the date of the filing of the return, including any amended return showing an increase in the tax owed. Where an amended return is filed with the Department due to a change in a taxpayer's federal tax return, any deficiency in tax resulting therefrom shall be deemed to be assessed on the date of filing the amended return. 35 ILCS 5/903(a)(1), (3) (West 2010).

¶ 16    With respect to taxpayers under federal audit, the Department's regulation provided that:

"A taxpayer who is under federal audit may participate in the Amnesty Program by following the procedure set out in subsection (k) above and making a good faith estimate of the increased liability that may be owed to the Department. For purposes of participating in the Amnesty Program only, a taxpayer may file an amended return reporting a federal change prior to receiving final notification from the Internal Revenue Service that the change has occurred. Although participants in the Amnesty Program may not seek or claim refunds, a limited exception to this rule will be permitted for taxpayers whose refund claims are based upon final determinations of the Internal Revenue Service or the federal courts." 27 Ill. Reg. 15161, 15170.

¶ 17    Summary judgment is proper when "the pleadings, depositions, and admissions on file,

-5-

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). We review the circuit court's grant of summary judgment *de novo*. *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 93 (2010).

¶ 18 This case requires us to interpret the 2003 Amnesty Act. The primary purpose of statutory construction is to determine and give effect to the intent of the legislature. *Brucker v. Mercola*, 227 Ill. 2d 502, 513 (2007). The best indication of that intent is the language of the statute, which must be given its plain and ordinary meaning. *People v. Hammond*, 2011 IL 110044, ¶ 53. It is improper for a court to depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). Statutory interpretation is a question of law that we review *de novo*. *Mattis v. State Universities Retirement System*, 212 Ill. 2d 58, 76 (2004).

¶ 19 The question before us is the meaning of the phrase "all taxes due" in the 2003 Amnesty Act. The appellate court held that this phrase refers to those taxes that a taxpayer knew were due and owing during the amnesty period. The Department disagrees and looks to the dictionary definitions of "due" and "owing." The Department also cites section 601(a) of the Income Tax Act, which provides, as indicated above, that a taxpayer shall pay any tax due on or before the date for filing a return for the tax period, without assessment, notice, or demand. Thus, according to the Department, a tax liability becomes "due" on the date that the tax return must be filed. MetLife's income tax liabilities for 1998 and 1999 became due in 1999 and 2000, respectively. Its unpaid tax liabilities were eligible for amnesty because at the time of the amnesty period, MetLife had unpaid tax liabilities for tax periods covered by the 2003 Amnesty Act. The Department argues that the appellate court erred in finding that by paying the amount of taxes that it reported on its 1998 and 1999 income tax returns, MetLife paid all taxes due at that time.

¶ 20 The 2003 Amnesty Act does not define the phrase "all taxes due." Where a term is undefined, we presume that the legislature intended the term to have its popularly understood meaning. *People v. Maggette*, 195 Ill. 2d 336, 349 (2001). It is appropriate to employ a dictionary to ascertain the meaning of an otherwise undefined word or phrase. *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 8 (2009). Black's Law Dictionary defines "due" as "[i]mmediately enforceable" and "[o]wing or payable; constituting a debt." Black's Law Dictionary 574 (9th ed. 2009). Taxes generally become due upon the deadline for filing a tax return. MetLife does not argue otherwise. In this sense, Illinois' taxing scheme is consistent with the federal scheme. Section 601(a) of the Income Tax Act provides that a taxpayer shall pay income taxes on or before the date for filing a return for the tax period without assessment, notice, or demand. This provision is consistent with section 6151(a) of the federal Internal Revenue Code, which provides that when a tax return is required to be filed, the taxpayer shall, without assessment or notice and demand, pay such tax at the time and place for filing the return, without regard to any extension of time for filing the return. 26 U.S.C. § 6151(a) (2006). See *Baral v. United States*, 528 U.S. 431, 437 (2000) (section 6151(a) of the Internal Revenue Code directly contradicts the concept that payment of income tax may be made only when the liability is known and fixed by assessment). We also

-6-

note section 203(e)(1) of the Income Tax Act, which provides in pertinent part that "a taxpayer's gross income, adjusted gross income, or taxable income for the taxable year shall mean the amount of gross income, adjusted gross income or taxable income properly reportable for federal income tax purposes for the taxable year under the provisions of the Internal Revenue Code." 35 ILCS 5/203(e)(1) (West 2010).

¶ 21    MetLife argues that section 601(a) does not govern the meaning of the phrase "all taxes due" in the 2003 Amnesty Act, particularly when federal changes are involved. It contends that, pursuant to section 506(b) of the Income Tax Act, it had an obligation to report and pay the additional tax to the Department only when the federal changes were finalized and the additional tax was known. We reject MetLife's argument. Section 506(b) contains only a reporting requirement. Taxpayers with a federal change must report the change to the Department within 120 days of the finalization of that change. The language of that section does not prevent taxpayers with a federal change liability from participating in the amnesty program.

¶ 22    In arguing that the phrase "all taxes due" in the 2003 Amnesty Act means taxes assessed and due at the time the amnesty application is made, MetLife relies on two appellate court cases interpreting a previous amnesty law, the 1984 Tax Delinquency Amnesty Act (1984 Amnesty Act) (Pub. Act 83-1428 (eff. Sept. 16, 1984)). The language of that statute also contained the phrase "all taxes due" found in the 2003 statute. MetLife cites *Schmidt v. Department of Revenue*, 163 Ill. App. 3d 269 (1987). There, the plaintiff paid taxes under protest and sought administrative review. While the case was pending, the legislature enacted the 1984 Amnesty Act and the plaintiff applied for amnesty as to the taxes in dispute. The Department granted the plaintiff's application and subsequently filed a motion to dismiss the plaintiff's complaint for administrative review, arguing that the plaintiff's amnesty application amounted to an election of remedies. The circuit court granted the motion and the plaintiff appealed. The appellate court affirmed. The court determined that the plain meaning of the provisions of the 1984 Amnesty Act indicated that the purpose of the statute was to create finality with respect to the Department's tax assessments. The court noted that the statute provided for payment of "all taxes due" and that upon such payment, the Department would not seek further collection or enforcement action. The appellate court found that since the statute referred to the amount of tax due upon making the amnesty application and did not contemplate litigation by either the Department or the taxpayer, the language "all taxes due" meant those taxes assessed and due at the time the amnesty application was made, rather than amounts that might ultimately be found to be due following judicial review. *Id*. at 273.

¶ 23    *Figgie International, Inc. v. Department of Revenue*, 167 Ill. App. 3d 196, 202 (1988), also cited by MetLife, followed *Schmidt*. These two cases do not help MetLife's cause. *Schmidt*'s interpretation of the phrase "all taxes due" in the 1984 Amnesty Act was made in the context of determining that the legislature intended assessments of taxes made pursuant to an amnesty application to be final and not subject to judicial review. There was no question in *Schmidt* as to when the taxes were actually due and payable. The same reasoning applies to *Figgie*, which simply followed the reasoning in *Schmidt*. MetLife argues that the legislature is presumed to have acted with knowledge of the holdings of these two cases

when it enacted the 2003 Amnesty Act. However, since neither *Schmidt* nor *Figgie* made a judicial determination as to when taxes were due, MetLife's argument fails.

¶ 24    MetLife emphasizes that its federal change tax liability was unknown to it or the Department at any time during the amnesty period. It argues that because, as of the end of the amnesty period, MetLife was disputing some of the proposed federal changes and was still receiving from the IRS notices of proposed adjustment after the amnesty period expired, it could not have made even an educated guess as to its increased Illinois tax liability, let alone a good-faith estimate. MetLife argues that section 601(a) of the Income Tax Act does not govern payments under a tax amnesty program or payments of federal change tax liabilities. Rather, according to MetLife, section 601(a) governs only the filing of a taxpayer's initial return. MetLife's only support for this argument, however, is its citation of the 1984 Amnesty Act and the two appellate court cases interpreting it. As we have concluded, MetLife's reliance on the 1984 statute and on *Schmidt* and *Figgie* is misplaced. In any event, the legislature was aware of section 601(a) when it drafted the 2003 Amnesty Act and it did not provide for a different time frame for the payment of taxes eligible for amnesty.

¶ 25    MetLife also notes that subsequent to the enactment of the 2003 Amnesty Act, the legislature enacted the 2010 Amnesty Act (35 ILCS 745/1 *et seq.* (West 2010)). In connection with that statute, the legislature amended the Uniform Penalty and Interest Act to provide that unpaid tax liabilities for tax periods between June 30, 2002, and July 1, 2009, must be satisfied within the 2010 amnesty period to avoid double interest, "except for any tax liability reported pursuant to Section 506(b) of the Income Tax Act (35 ILCS 5/506(b)) that is not final." 35 ILCS 735/3-2(g) (West 2010). MetLife argues that this amendment was a clarification of the legislature's intent in enacting the 2003 Amnesty Act. It asserts that it was unnecessary to include language in section 3-2 exempting nonfinal tax liabilities from the 2003 amnesty program because the Department's regulations under the 1984 Amnesty Act did not suggest that a nonfinal federal change tax liability would be included in the 2003 amnesty program. MetLife surmises that, with knowledge of the Department's regulations under the 2003 Amnesty Act, the legislature found it necessary to expressly carve out an exception for those nonfinal tax liabilities. We note that, generally, a material change made by an amendatory act in the language of an unambiguous statute creates a presumption of a change in legal rights, although this presumption can be rebutted by evidence of a contrary legislative intent. *People v. Woodard*, 175 Ill. 2d 435, 449 (1997). The circumstances surrounding the enactment of an amendment must be considered. If they indicate that the legislature intended to interpret the original act, the presumption of change will be rebutted. An amendment of an unambiguous statute indicates a purpose to change the law, while no such purpose is indicated by the mere fact of an amendment of an ambiguous provision. *O'Connor v. A&P Enterprises*, 81 Ill. 2d 260, 271 (1980). MetLife does not direct our attention to any such circumstances surrounding passage of the 2010 Amnesty Act and the amendment of section 3-2 of the Income Tax Act, relying instead exclusively on *Schmidt* and *Figgie* and its claim that the legislature accepted those judicial interpretations of "taxes due" in enacting the 2003 Amnesty Act. We have already rejected this argument. We likewise reject MetLife's argument that passage of the 2010 Amnesty Act and the accompanying

amendment to section 3-2 of the Income Tax Act were intended merely to clarify the legislature's intent in enacting the 2003 Amnesty Act.

¶ 26     MetLife argues that the appellate court was not required to defer to the Department's "overreaching regulations" after finding them to be illogical and that the regulations exceeded the legislative intent of the 2003 Amnesty Act. MetLife asserts that the payment of a good-faith estimate of tax liability to participate in the amnesty program was required only by the Department's regulations. We have effectively rejected this argument above in finding that the phrase "all taxes due" in the 2003 Amnesty Act refers to those taxes due at the time the initial return is required to be filed. In addition, as noted by the Department's counsel at oral argument, it is not useful to compare the 1984 Amnesty Act to the 2003 Amnesty Act because in 1984, there was no need to make a good-faith estimate of taxes due since there was no requirement that taxpayers participate in the amnesty program and there was no penalty for not participating. In 2003, the legislature imposed a 200% interest penalty on those taxpayers who did not participate; thus, it was necessary to provide a way for taxpayers whose tax liability was uncertain to participate in the program. The Department's good-faith estimate regulation made that participation possible. We therefore reject MetLife's argument that the Department's regulations overreached and contradicted the legislative intent of the Amnesty Act.

¶ 27     While this case was in the briefing stage, this court allowed the Department to cite an appellate case whose decision is contrary to that of the appellate decision here. In *Marriott International Inc. v. Hamer*, 2012 IL App (1st) 111406, the IRS began an audit in 2004 of Marriott's federal tax returns for the years 2000 through 2002. That audit resulted in additional federal income tax liability for those years. Following a state audit, the Department determined that Marriott owed additional state tax. Because the 2003 Amnesty Act applied to Marriott's tax returns and Marriott did not pay all of its Illinois income tax liability during the amnesty period, the Department assessed 200% interest on Marriott's unpaid tax liability. Marriott paid the taxes and interest under protest. The trial court granted summary judgment to Marriott on the basis that because Marriott had paid all the taxes it reported on its tax returns and because it did not know of its additional tax liability during the amnesty period, double interest did not apply. The appellate court reversed, finding that the phrase "all taxes due" in the 2003 Amnesty Act meant all taxes properly reportable for federal income tax purposes for the taxable year, pursuant to section 203(e)(1) of the Income Tax Act. *Id.* ¶ 26. The court also rejected Marriott's reliance on *Schmidt* and agreed with Justice Hoffman's dissent in the instant case. *Id.* ¶¶ 36, 41.

¶ 28     We agree with the appellate court in *Marriott* and with Justice Hoffman in the instant case and hold that the plain and ordinary meaning of the phrase "all taxes due" in the 2003 Amnesty Act refers to taxes that are due based upon properly reportable income at the time the taxpayer's tax return is required to be filed. Therefore, when MetLife failed to pay those taxes during the amnesty period, it became liable for the 200% interest the Department imposed.

¶ 29     MetLife also argues that imposition of the 200% interest under the facts of this case violated its right to substantive due process. MetLife raised this issue in the appellate court but the court did not reach the issue in light of its decision holding that MetLife was

-9-

improperly assessed 200% interest.

¶ 30    The power of the state to impose fines and penalties for a violation of its statutory requirements is coeval with government. *In re Marriage of Miller*, 227 Ill. 2d 185, 196 (2007). However, the legislature's authority to set such fines and penalties is limited by the requirements of due process. *St. Louis, Iron Mountain & Southern Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919). Where, as here, the statute at issue does not implicate a fundamental constitutional right, courts employ the rational basis test to determine whether the statute satisfies due process. Under this test, the statute need only bear a reasonable relationship to a legitimate state interest. *Miller*, 227 Ill. 2d at 197. A statutory penalty will not run afoul of due process unless it is so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable. *Id*. at 198.

¶ 31    MetLife does not argue that the state lacked a legitimate interest that was served by the double interest penalty or that the 200% interest provision lacks a reasonable relationship to a legitimate state interest. Rather, it argues that the provision should not have been applied to it because it did not know during the amnesty period what its federal change tax liability was going to be. MetLife contends that the Department's "good-faith estimate" regulations compounded the problem by attempting to coerce MetLife into overpaying its additional Illinois income tax liability to avoid being subjected to the double interest. According to MetLife, any good-faith estimate would have amounted to nothing more than a guess, given the numerous issues raised by the IRS in the federal audit.

¶ 32    The Department responds that charging MetLife 200% interest on taxes not paid during the amnesty period is rationally related to the state's legitimate interest in raising revenue. According to the Department, the legislature enacted the 2003 Amnesty Act at a time of financial crisis and the double interest provision served as an appropriate "stick" to encourage taxpayers to pay any unpaid tax liability during the amnesty period. Further, notes the Department, it provided by regulation for refunds for taxpayers who overestimated their tax liability and thus overpaid their taxes during the amnesty period.

¶ 33    We agree with the Department. We find that the 2003 Amnesty Act bore a reasonable relationship to the state's legitimate interest in raising revenue. The legislature gave taxpayers in MetLife's position an opportunity to avoid the statutory 200% interest by making a good-faith estimate of their tax liability and paying that liability during the amnesty period. Further, we reject MetLife's argument that even had it made a good-faith estimate and paid those taxes during the amnesty period, there is no guarantee that it could have obtained a refund of any overpayment, given the one-year limitation on applying for refunds. MetLife's argument is hypothetical and speculative because it chose not to make a good-faith estimate of its increased tax liability and did not pay any of the tax deficiency during the amnesty period. Those taxpayers who paid their tax liability during the amnesty period were rewarded with a 100% abatement of interest and penalties and were protected from any civil or criminal liability. Those who chose not to make a good-faith estimate of their tax liability during the amnesty period were penalized for failing to do so. Although 200% interest is a considerable penalty, we do not find it to be so arbitrary and unreasonable as to violate substantive due process.

¶ 34                                    CONCLUSION

¶ 35         We hold that the phrase "all taxes due" in the 2003 Amnesty Act means taxes that were properly reportable at the time the initial tax return was required to be filed, rather than taxes known to be due during the amnesty period. We further hold that the imposition of 200% interest pursuant to section 3-2(f) of the Uniform Penalty and Interest Act upon taxpayers who failed to pay a tax liability eligible for amnesty under the 2003 Amnesty Act does not violate substantive due process.

¶ 36         Appellate court judgment reversed.

¶ 37         Circuit court judgment reversed.

¶ 38         JUSTICE BURKE, dissenting:

¶ 39         The 2003 Tax Delinquency Amnesty Act (Amnesty Act) established an amnesty program which allowed a delinquent taxpayer to pay "all taxes due" for any taxable period after June 30, 1983, and prior to July 1, 2002, during a six-week reporting period from October 1, 2003, through November 15, 2003. 35 ILCS 745/10 (West 2004). For taxpayers participating in the program, the Illinois Department of Revenue (Department) would abate and not seek to collect any applicable interest or penalties, nor would the Department seek civil or criminal prosecution. *Id.* At the same time the legislature extended this carrot, it also extended a stick, amending section 3-2 of the Uniform Penalty and Interest Act to provide that a taxpayer who had "a tax liability that is eligible for amnesty" under the Amnesty Act but who failed to pay that liability during the amnesty period was subject to a penalty of 200% interest. 35 ILCS 735/3-2(f) (West 2004).

¶ 40         MetLife, the taxpayer in this appeal, was hit with the stick and assessed a 200% interest penalty for its failure to participate in the 2003 amnesty program. This assessment was made by the Department even though MetLife was undergoing both a state and federal audit during the amnesty period and even though MetLife owed *no* taxes to the state at that time. Further, even if MetLife had wished to apply for amnesty in order to reap the corresponding benefits of no interest or penalties, it could not have done so. At the time of the amnesty program, neither the Department nor MetLife knew whether MetLife owed *any* additional taxes to the State of Illinois, let alone the amount of such tax liabilities.

¶ 41         Both the lower courts recognized that MetLife was wrongfully penalized for its failure to pay "all taxes due" during the amnesty period, when no determination had been made at that time that MetLife owed taxes to the state and no determination had been made that it was a delinquent taxpayer. 2012 IL App (1st) 110400. The majority, however, now reverses the lower courts, holding that MetLife was subject to the double interest penalty because it failed to prepay the correct amount of taxes "due" to the state during the time period covered by the Amnesty Act. *Supra* ¶ 35. In my view, the result reached by the majority goes far beyond what the legislature intended when it enacted the Amnesty Act and offends basic principles of logic and common sense. I therefore dissent.

¶ 42                                     I. Background

¶ 43     MetLife timely filed its Illinois corporate income tax returns for tax years 1998 and 1999 and paid the tax liabilities reported on those returns. On December 12, 2000, the United States Internal Revenue Service (IRS) began a routine audit of the consolidated federal income tax returns that MetLife and its non-unitary subsidiaries had filed for tax years 1997, 1998, and 1999. The federal audit was completed in July 2004, more than 3½ years after it commenced. In May 2002, the Illinois Department of Revenue began an audit of MetLife's state corporate income tax returns for tax years 1998 and 1999. The state audit was not concluded until May 2007, approximately five years after its commencement. Thus, at the time of the 2003 amnesty period, from October 1, 2003, through November 15, 2003, neither MetLife nor the Department knew whether MetLife owed any additional state income taxes for tax years 1998 and 1999.

¶ 44     In August 2004, approximately nine months after the expiration of the amnesty period, MetLife provided its finalized federal audit adjustments to the Department's auditor pursuant to section 506(b) of the Illinois Income Tax Act (35 ILCS 5/506(b) (West 2010)). The auditor incorporated these federal changes into the state income tax audit and determined that MetLife owed additional income taxes for 1998 and 1999 as a result of the federal changes (the "federal change tax liability"). Over the course of the ongoing state audit, MetLife made three separate payments to the Department for its additional income tax liability. MetLife made its first payment of $678,191 on February 24, 2005, after receiving and executing a document entitled "Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overpayment" (Form IL-870). The state auditor later discovered an error in the computation of MetLife's federal change tax liability, after which MetLife paid an additional $270,085 on January 11, 2006. MetLife made its final payment of $705,879 in May 2007 at the conclusion of the state audit.

¶ 45     On May 8, 2008, the Department assessed double interest totaling $2,207,456 against MetLife with respect to its federal change tax liability because MetLife failed to participate in the amnesty program. MetLife paid the penalty under protest and filed the instant verified complaint for injunction and declaratory judgment. While MetLife conceded that it owed single interest on its unpaid tax liabilities for 1998 and 1999, it objected to the imposition of the double interest penalty. MetLife contended that it should not have been penalized for its failure to participate in the amnesty program where it had no present liability for unpaid state income taxes at that time.

¶ 46     Both the trial and appellate courts held that MetLife did not have a tax liability eligible for amnesty and could not have participated in the amnesty program when it did not know during the amnesty period whether it owed any additional income taxes.


¶ 47                                     II. Analysis

¶ 48     For the Department to impose the penalty of 200% interest under 3-2 of the Uniform Penalty and Interest Act (35 ILCS 735/3-2(f) (West 2004)), the taxpayer must have had a "tax liability that is eligible for amnesty under the [Amnesty Act]," and the taxpayer must

-12-

have failed "to satisfy the tax liability during the amnesty period provided for in that Act." In turn, for there to be a "tax liability" eligible for amnesty under section 10 of the Act, there had to be "taxes due" from the taxpayer during the taxable period ending after June 30, 1983, and prior to July 1, 2002. Thus, this case turns on the meaning of the phrase "taxes due" in section 10 of the Amnesty Act.

¶ 49    The majority holds that "the plain and ordinary meaning of the phrase 'all taxes due' in the 2003 Amnesty Act refers to taxes that are due based upon properly reportable income at the time the taxpayer's tax return is required to be filed." *Supra* ¶ 28. The sole legal authority cited by the majority for this conclusion is section 601(a) of the Income Tax Act (35 ILCS 5/601(a) (West 2004)). *Supra* ¶ 20. Section 601(a) states that taxes reported on a tax return are "due thereon" at the time a taxpayer files the return. Thus, the majority holds that, even though MetLife did not actually know whether it owed additional taxes during the amnesty period, those taxes were nevertheless "due" at the time MetLife filed its returns in 1998 and 1999 and, therefore, MetLife had a "tax liability" subject to the Act. I disagree.

¶ 50    It is always a risky undertaking to lift a statutory term from one context and place into another (see, *e.g.*, *People v. Vincent*, 226 Ill. 2d 1 (2007)), and the majority has erred in doing so here. We cannot rely on the definition of "due" in section 601(a) because the intent of the Amnesty Act is to punish taxpayers who had a known delinquency at the time of the amnesty period. Incorporating the meaning of "due" from section 601(a) into the Act has the perverse effect of punishing a taxpayer for failing to pay an unknown and as yet undetermined liability. This is absurd on its face and cannot be correct.

¶ 51    That the legislature intended to punish taxpayers who were in delinquency at the time of the amnesty period is obvious from the plain language of the Amnesty Act. The title of the Act is the Tax Delinquency Amnesty Act. 35 ILCS 745/10 (West 2004). The term "delinquency" is defined as "1. A failure or omission; a violation of a law or duty. *** 2. A debt that is overdue in payment." Black's Law Dictionary 493 (9th ed. 2009). It is thus evident that the legislature intended to punish delinquent taxpayers who were not in compliance with the Illinois tax laws at the time of the amnesty program. Legislative statements further underscore this point. See, *e.g.*, 93d Ill. Gen. Assem., House Proceedings, May 29, 2003, at 158 (statements of Representative Black) ("I would simply submit that the cost of going after some of the scoff laws can exceed the amount of money that we sometimes are able to collect. *** I think it's a reasonable attempt in a very difficult fiscal period to try and convince some people to get caught up in their tax payments."); 93d Ill. Gen. Assem., Senate Proceedings, May 31, 2003, at 41 (statements of Senator Welch) ("This is for past-due taxes ***, and the idea here is that we can get these taxes due off the books ***."); 93d Ill. Gen. Assem., Senate Proceedings, May 31, 2003, at 43 (statements of Senator Link) ("What we're trying to do is collect a bill—an undue tax burden to our State from people that owe us money and that are willing to pay ***."); 93d Ill. Gen. Assem., Senate Proceedings, May 31, 2003, at 47 (statements of Senator Welch) ("What we're doing here is saying an amnesty means they admit that they owe a certain amount of money. If they didn't admit they owed it, they wouldn't pay that amount.").

¶ 52    In addition, later amendments to the Amnesty Act and the Uniform Penalty and Interest Act reveal that the legislature never intended for amnesty to apply to taxpayers who were

under audit and were unaware of the existence or amount of additional taxes owed to the State. In 2010, the General Assembly amended the Act to establish another amnesty period which was nearly identical to the 2003 amnesty program, with one notable exception. See 35 ILCS 745/10 (West 2010). The double interest penalty was imposed on taxpayers who failed to satisfy a tax liability which was eligible for the 2010 amnesty program, "except for any tax liability reported pursuant to Section 506(b) of the Illinois Income Tax Act (35 ILCS 5/506(b)) that is not final." 35 ILCS 735/3-2(g) (West 2010). In other words, taxpayers with nonfinal tax liabilities were specifically excluded from participation in the 2010 amnesty program and thus were exempt from the double interest penalty. The 2010 amendments make it absolutely clear that the legislature never intended to penalize taxpayers who had uncertain future tax liabilities for their failure to pay taxes during the amnesty period.

¶ 53    In light of the foregoing, the phrase "taxes due" under section 10 of the Amnesty Act, in my view, must mean a known delinquency at the time of the amnesty period. Under this standard, the relevant question is whether MetLife was a delinquent taxpayer which had a known tax debt owing to the Department at the time of the amnesty period. To illustrate why MetLife was not a delinquent taxpayer, it is helpful to examine the state laws pertaining to income tax filing. Income tax collection in Illinois is based on self-assessment.[1]

¶ 54    Under section 601(a) of the Illinois Income Tax Act, a taxpayer files a return, which discloses what the taxpayer owes the state in income tax. 35 ILCS 5/601(a) (West 2004). The amount of tax shown on the tax return is "due thereon" to the Department, and no assessment, notice, or demand by the Department is required. *Id.* The amount of tax shown on the return is deemed to be assessed on the date of filing of the return. 35 ILCS 5/903(a) (West 2004). As soon as practicable after the return is filed, the Department shall examine the return to determine whether it states the correct amount of tax. 35 ILCS 5/904(a) (West 2004). If the Department finds that the tax amount shown on the return is less than the correct amount of tax, the Department "shall issue a notice of deficiency to the taxpayer which shall set forth the amount of tax and penalties proposed to be assessed." *Id.* The notice of deficiency constitutes an assessment of the tax and penalties specified in the notice after 60 days have passed without the taxpayer filing a protest. 35 ILCS 5/904(d) (West 2004).

¶ 55    Regardless of whether a notice of deficiency has been issued, a taxpayer is required to report to the Department any change to its federal taxable income. 35 ILCS 5/506(b) (West 2004). Such report may be in the form of an amended Illinois tax return or other form of notification and must be filed within 120 days of an agreement or final determination by the IRS. *Id.* Amended Illinois returns used to report such a federal change are required to be signed under penalties of perjury. 35 ILCS 5/504 (West 2004). Where a taxpayer files a report or amended return pursuant to section 506(b), any deficiency in Illinois tax resulting from the change to federal taxable income "shall be deemed to be assessed on the date of

---

[1]Federal income taxes are also self-assessed. See 26 U.S.C. § 6151(a) (2006); *Baral v. United States*, 528 U.S. 431, 437 (2000) (income taxes may be "paid" prior to formal assessment of the taxes); see also *Flora v. United States*, 362 U.S. 145, 176 (1960) ("Our system of taxation is based upon voluntary assessment and payment, not upon distraint.").

filing such report or amended return and such assessment shall be timely notwithstanding any other provisions of this Act." 35 ILCS 5/903(a)(3) (West 2004). The Department may then issue a notice of deficiency for additional Illinois income taxes due within two years after the date of the taxpayer's report or amended return. 35 ILCS 5/905(e)(2) (West 2004).

¶ 56        Importantly, the Department's determination of additional Illinois income taxes due based on federal changes to taxable income does not mean that a taxpayer violated the Income Tax Act when filing its original return. A taxpayer's original return is properly prepared and filed where it reports to Illinois, under penalties of perjury, the federal taxable income and other amounts disclosed to the IRS on the taxpayer's federal return. See generally 35 ILCS 5/203(b), 403(b) (West 2004). In the event that a taxpayer is required to amend its original return and pay additional income taxes based on federal changes, the taxpayer is not treated as delinquent by the Income Tax Act. Although the taxpayer may be required to pay interest accruing to the date of its original return (35 ILCS 735/3-2 (West 2004)), no additional penalty is assessed for underreporting taxes on the original return or failing to pay the additional taxes when the original return was filed (see generally 35 ILCS 735/3-3(b) to (b-20), (c) (West 2004) (setting forth penalties for underreporting and underpaying taxes)).

¶ 57        In the case at bar, MetLife timely filed its Illinois income tax returns for 1998 and 1999 and paid the taxes shown on the returns at the time and place required by section 601(a) of the Income Tax Act.[2] During the six-week 2003 amnesty period, MetLife was undergoing a federal and state audit of its income taxes. As of the end of the amnesty period, the Department had not issued a notice of deficiency indicating that MetLife owed additional Illinois income taxes, nor had the IRS made a final determination of changes to MetLife's federal taxable income. In July 2004, approximately eight months *after* the expiration of the amnesty period, MetLife was notified that its federal taxable income had been adjusted by the IRS due to the federal audit. MetLife subsequently reported to the Department the finalized federal changes within 120 days after the IRS determination, pursuant to section 506(b) of the Income Tax Act. The tax liabilities based on the federal changes were not deemed to be assessed until MetLife reported those changes to the Department. See 35 ILCS 5/903(a)(3) (West 2004). MetLife later paid its additional income taxes in accord with the results of the audit and paid interest accruing to the due date of its original returns. See 35 ILCS 735/3-2(c) (West 2004). MetLife did not protest the assessment of single interest because such interest was not a penalty for its failure to pay taxes. Rather, the interest compensated the state for the amount of MetLife's additional income taxes that, with earlier resolution of uncertain tax issues, it would have paid to the state on the due date of its original tax returns for 1998 and 1999.

¶ 58        MetLife thus was in full compliance with the Illinois tax laws with regard to the manner

---

[2]I note that the Department has not alleged that MetLife intentionally underreported its taxable income on its 1998 and 1999 tax returns. Under penalty of perjury (35 ILCS 5/504 (West 2004)), MetLife reported what it believed to be the properly payable amount of income tax liability at the time it filed its returns.

in which it reported and paid its taxes due to the State of Illinois. MetLife met all applicable deadlines set by the Illinois Income Tax Act and followed the statutory procedures for reporting and paying federal change tax liabilities, including interest, to the Department. Accordingly, since MetLife was under no legal obligation at the time of the amnesty period to report any federal changes to its taxable income, nor did MetLife owe any additional Illinois income taxes to the Department, MetLife obviously was not eligible to participate in the amnesty program.

¶ 59    The result reached by the majority leads to absurd results which the legislature could not possibly have intended. See *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007) ("when undertaking the interpretation of a statute, we must presume that when the legislature enacted a law, it did not intend to produce absurd, inconvenient or unjust results"). The majority's interpretation of the Amnesty Act punishes MetLife for failing to prepay an unascertainable amount of taxes before those taxes were actually due to the Department according to the provisions of the Income Tax Act. Further, the majority's reading penalizes MetLife with double interest for not paying a tax that the Income Tax Act did not require it to pay, and which the Department could not have collected before the audit was concluded, a time long after the amnesty period had ended. The majority's construction is inconsistent with the statutory language of the Act, which targets taxpayers who were delinquent at the time of the amnesty period. MetLife is not included in this group of taxpayers. It is unreasonable to suggest that the General Assembly intended to punish taxpayers for their inability to predict a future federal change tax liability. It is therefore absurd to define "all taxes due" to mean uncertain additional tax liability that was not known either to the taxpayer or to the Department during the 2003 amnesty period.

¶ 60    The Department maintains that any absurdities or uncertainties regarding the interpretation of the Amnesty Act are addressed by the Department's emergency rules promulgated pursuant to the Act (27 Ill. Reg. 15161 (emergency rule eff. Sept. 11, 2003)). The rules purport to require taxpayers to pay their entire tax liability during the amnesty period, "irrespective of whether that liability is known to the Department or the taxpayer," and require taxpayers under audit during the amnesty program to make a "good faith estimate" of their tax liability and to pay the estimated taxes to the Department.

¶ 61    The Department's emergency rules impose requirements that go far beyond those recognized by the 2003 Amnesty Act itself. The General Assembly directed the Department to adopt rules as necessary to implement the Amnesty Act (35 ILCS 745/10 (West 2004)), but did not authorize it to collect taxes even when the Department does not know if there is a tax liability. The Department's regulations improperly require taxpayers under audit to guess the amount of their federal changes in order to avoid the risk of paying double interest on any shortfall. There is no instruction provided as to how a taxpayer might go about making a "good faith estimate" of unpaid taxes, particularly where, as in this case, MetLife was still negotiating proposed federal adjustments with the IRS well after the amnesty period ended. The appellate court below stated that they were "unable to discern any logical interpretation" of the Department's rules. 2012 IL App (1st) 110400, ¶ 23. I agree. The rules do not dispel the absurdity of the majority's interpretation of the Act, they contribute to it.

¶ 62    Because MetLife was not a delinquent taxpayer and owed no income taxes to the state

during the 2003 amnesty period, MetLife was not eligible for amnesty and should not have been subject to a double interest penalty. The majority's holding to the contrary is unreasonable and unjust. I therefore dissent.

¶ 63       JUSTICE KARMEIER joins in this dissent.