# Illinois Official Reports

## Supreme Court

---

*Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.,*
**2014 IL 115526**

---

Caption in Supreme Court:

HOME STAR BANK AND FINANCIAL SERVICES, Guardian of the Estate of Edward Anderson, a Disabled Person, *et al.*, Appellees, v. EMERGENCY CARE AND HEALTH ORGANIZATION, LTD., *et al.*, Appellants.

Docket No.

115526

Filed

March 20, 2014

Held

(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*)

When a hospital's emergency room physician responded to a Code Blue by going to the intensive care unit, his alleged negligence there was not immunized by the Good Samaritan Act, even though no fee was charged for his services, where he was expected to respond to Code Blues as part of his job.

Decision Under Review

Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Elizabeth M. Budzinski, Judge, presiding.

Judgment

Affirmed.

Counsel on
Appeal

Kevin J. Vedrine, Christopher J. Solfa and Robert L. Larsen, of
Cunningham, Meyer & Vedrine, P.C., of Warrenville, for appellant.

Keith A. Hebeisen, of Clifford Law Offices, of Chicago (Robert P.
Sheridan, of counsel), for appellees.

Mary Alice McLarty and Valerie M. Nannery, of Washington, D.C.,
and James P. Costello, of Costello, McMahon, Burke & Murphy, Ltd.,
of Chicago, for *amicus curiae* American Association for Justice.

Justices

JUSTICE THOMAS delivered the judgment of the court, with
opinion.
Chief Justice Garman and Justices Freeman, Kilbride, Karmeier,
Burke, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiffs, Darby Thomas and Home Star Bank & Financial Services, as guardian of the
estate of Edward Anderson, a disabled person, filed suit against defendants Michael T.
Murphy, D.O., and his employer, Emergency Care & Health Organization, Ltd. (ECHO),
alleging that Dr. Murphy was negligent in treating Anderson. The circuit court of Cook County
concluded that Dr. Murphy was immune from liability pursuant to section 25 of the Good
Samaritan Act (the Act) (745 ILCS 49/25 (West 2010)) and granted summary judgment to
defendants. Plaintiffs appealed, and the Appellate Court, First District, reversed and remanded.
2012 IL App (1st) 112321. The court held that the Act was meant to apply to volunteers, not to
those who treat patients within the scope of their employment and are compensated for doing
so. We allowed defendants' petition for leave to appeal and, for the reasons that follow, we
affirm the appellate court.

¶ 2                                BACKGROUND
¶ 3    On August 22, 2001, Anderson was admitted to Provena St. Mary's Hospital through the
emergency room and was later transferred to the intensive care unit. Anderson was diagnosed
with epiglottitis. On August 25, Anderson began having labored breathing and pain on
swallowing. A Code Blue was called at approximately 3:20 a.m. Dr. Murphy, who was
working in the emergency room at the time, responded to the Code Blue and attempted to
intubate Anderson. Anderson suffered a severe and permanent brain injury. Plaintiffs filed a
negligence action against Dr. Murphy and ECHO, alleging that Dr. Murphy's care and
treatment of Anderson were the cause of Anderson's injuries.

¶ 4     Dr. Murphy denied the allegations and moved for summary judgment, asserting that he was immune from liability for negligence under section 25 of the Act. ECHO later joined the motion for summary judgment. Section 25 provides as follows:

> "Any person licensed under the Medical Practice Act of 1987 or any person licensed to practice the treatment of human ailments in any other state or territory of the United States who, in good faith, provides emergency care without fee to a person, shall not, as a result of his or her acts or omissions, except willful or wanton misconduct on the part of the person, in providing the care, be liable for civil damages." 745 ILCS 49/25 (West 2010).

Dr. Murphy contended that section 25 applied because he provided emergency care to Anderson, and Anderson was not billed for that care. Although ECHO had billed Anderson for services its physicians provided him during a previous emergency room visit on August 22, 2001, it did not bill for Dr. Murphy's services during the Code Blue. The hospital billed Anderson for supplies used during the Code Blue, but not for any physician's services.

¶ 5     In their response to the motion for summary judgment, plaintiffs argued that the Good Samaritan Act was inapplicable because Dr. Murphy was simply doing his job when he treated Anderson, and he was not providing his services "without fee." ECHO was the exclusive provider of emergency room physicians at Provena, and Dr. Murphy was under contract with ECHO. ECHO paid Dr. Murphy by the hour, and he was not allowed to bill patients directly. Plaintiffs argued that, just because no discrete bill was sent for Dr. Murphy's services, that did not mean that Dr. Murphy was providing his services "without fee."

¶ 6     The parties submitted various exhibits and discovery depositions in support of their positions. First, with respect to Dr. Murphy's job responsibilities, an "independent contractor agreement" between ECHO and Dr. Murphy provided that Dr. Murphy would provide emergency medical services in the hospital's emergency department and that he would be paid by the hour. The hourly amount would be the sole amount he would receive for his services. In addition to Dr. Murphy's responsibilities in the emergency department, the agreement provided that Dr. Murphy would have the following "inpatient" responsibilities:

> "Physician shall not provide any general or routine care of patients already hospitalized under the care of another physician.
>
> However, in dire emergencies, *i.e.*, cardiorespiratory (or impending) arrest, Physician may render service to any patient, as long as there is not an emergency department patient requiring his/her immediate presence, and only until the patient[']s personal physician has assumed ongoing care."

The agreement further provided that Dr. Murphy would abide by, and render emergency medical services in accordance with, the bylaws, rules and regulations of the hospital and departmental policies and procedures, using his professional judgment.

¶ 7     The "exclusive emergency room services agreement" between ECHO and the hospital provided that ECHO would be the exclusive provider of emergency room physician services at the hospital. Under the agreement, the "primary obligation of ECHO's physicians when in service at HOSPITAL's emergency room shall be to care for any and all patients presenting themselves for treatment at the emergency room." The agreement made clear that ECHO's physicians were independent contractors rather than employees of the hospital, and that they were to provide treatment only until the patient's attending physician could be present and

assume responsibility. ECHO's physicians were required to discharge their duties in accordance with the "Bylaws, Rules, Regulations, and policies of HOSPITAL and the MEDICAL STAFF Bylaws." Further, ECHO would bill patients directly for the services its physicians provided.

¶ 8 The hospital's "Clinical Operations/Nursing" policy set forth the procedures for the "Code Blue and Cardiac Arrest Team." This policy set forth the Code Blue responsibilities of the ER physician as follows:

> "Responds to all Code Blues in the hospital. Directs Code Blue Team in CPR, defibrillation and cardioversion and medication therapy. Intubates the patient. For DNR patients in Ancillary Departments, assess for Code continuance."

Nancy Frizzell, who was the nursing supervisor at St. Mary's on the night of Anderson's Code Blue, explained in her deposition that, although this document is a nursing policy, every employee of the hospital was expected to follow it. It was Frizzell's experience that when a Code Blue occurs at night, the emergency room physician normally responds. She said that when a Code Blue was called, the emergency room doctor would drop what he or she was doing to respond to the code. Also, even when physicians on the unit responded to a Code Blue, the emergency room doctor would come when he or she could.

¶ 9 In his deposition, Dr. Murphy left no doubt that responding to Code Blues was part of his job:

> "Q. Had you responded to any Code Blues at St. Mary's before this one?
>
> A. Yes.
>
> Q. And was the emergency—was the emergency room physician on duty the physician who would be expected to respond to a Code Blue?
>
> A. Yes.
>
> Q. Were you the only emergency physician working at that—that night at the hospital?
>
> A. Yes.
>
> Q. As soon as you were notified of the code, did you go immediately to the room?
>
> A. I believe so, yes."

¶ 10 Dr. Joseph Danna, the president and CEO of ECHO, was more equivocal in his deposition. When asked whether it was part of Dr. Murphy's job to respond to Code Blues, Danna said, "no," and that it "was not an inherent prescribed part of his work, of his job." Danna said that, rather, if there were a dire emergency elsewhere in the hospital, an ECHO physician would respond "in the manner a good samaritan would respond to that dire emergency." He assumed that Dr. Murphy responded to the Code Blue because he was the only person available to respond. Danna was aware that ECHO physicians responded to Code Blues at the hospital, but said that he had "no understanding" that they were "part of the team." Rather, they were one of many resources available, and an ECHO physician would typically be the last person that would respond.

¶ 11 Eunice Rimer was a certified registered nurse anesthetist who responded to Anderson's Code Blue. She testified in her deposition that she had worked at the hospital since 1994 and it was her understanding that the emergency room physician would respond when Code Blues were called. According to Rimer, the emergency room physician was "usually there first."

- 4 -

¶ 12    Anderson's laryngologist, Kenneth Johnson, testified that he received a call at home during the early morning of August 25. He was told that Anderson was having serious respiratory problems and that Dr. Murphy, the emergency room physician, was attempting an intubation. It was Dr. Johnson's understanding that an in-house emergency room physician would respond to Code Blues.

¶ 13    Paula Jacobi, the president and CEO of St. Mary's, acknowledged in her deposition that ECHO's agreement with the hospital did not specifically address whether ECHO physicians would respond to Code Blues. The nursing department "Code Blue and Cardiac Arrest Team" policy addressed the responsibility of the emergency room physician during a Code Blue, but Jacobi did not know if this was addressed in writing anywhere else. However, Jacobi testified that it had been hospital policy for many years that the emergency room physician would respond to Code Blues, but she did not know how that system was set up. Jacobi did not believe that anything specific needed to be said in the agreement with ECHO because she assumed that the long-standing practice would continue. If the emergency room physician was already treating a patient when the Code Blue was called, then the physician would have to exercise his medical judgment as to who had the more emergent needs.

¶ 14    With regard to billing for Code Blues, Jacobi explained that a Code Blue was a billable event. The hospital would typically bill for facility charges, and this was done in Anderson's case. The hospital billed for the drugs and equipment used on Anderson during the Code Blue. ECHO was responsible for billing for the services of its physicians, and Jacobi did not know whether ECHO billed for the services of its physicians during Code Blues.

¶ 15    Dr. Danna explained that ECHO contracted with a company called Per-Se Technologies to do its billing. ECHO billed only for services that its physicians provided in the emergency department. According to Dr. Danna, ECHO would never bill when a physician responded to a code outside the emergency department. ECHO did not bill for the services Dr. Murphy provided to Anderson and had never received payment for those services. ECHO would also sometimes choose not to bill in a situation in which a patient was particularly unhappy with emergency department care, or when the patient simply came in for a recheck or something very minor. In such a situation, the emergency room physician would have to request that the patient not be billed.

¶ 16    Heather Cluver, the office manager for ECHO management and consulting, testified that she was not familiar with how billing would be handled for Code Blues. However, she testified that sometimes a decision was made not to bill a patient for services in the emergency department. In such a situation, a request not to bill would have to come from the physician, and it would go through Dr. Danna. Dr. Danna would decide whether the patient would be billed.

¶ 17    Richard Mullin, partner/owner of Abrix Emergency Billing Services, LLC, testified that Abrix provides billing services for physician practices. Abrix handled the billing for ECHO's emergency room physicians from 1999 to 2003. ECHO would send a patient's chart to Abrix, and then Abrix would bill the insurance company. Mullin testified that they would get records from ECHO only if a patient was treated in the emergency room. Abrix no longer had any records for Anderson; they would have either been destroyed pursuant to a retention policy or turned over to a succeeding entity. Mullin did not recall any situations in which ECHO sent patient records to Abrix but then requested that they not bill.

¶ 18    The trial court granted summary judgment to defendants. The court believed that Illinois law supported defendants' position. Because ECHO never sent a bill to Anderson or his insurance carrier, Dr. Murphy was immune from liability under the Good Samaritan Act. The trial court acknowledged that a federal district court opinion, *Henslee v. Provena Hospitals*, 373 F. Supp. 2d 802 (N.D. Ill. 2005), would have compelled the opposite result. However, the court found that *Henslee* was out of step with Illinois law. The trial court gave plaintiffs leave to file an amended complaint alleging wilful and wanton misconduct. Plaintiffs filed fourth and fifth amended complaints alleging wilful and wanton misconduct, and later asked the trial court to make a Rule 304(a) finding with respect to the summary judgment on the negligence counts. The court granted the motion, finding no just reason to delay appeal or enforcement of the order.

¶ 19    Plaintiffs appealed, and the Appellate Court, First District, reversed. The appellate court acknowledged that the rule developed in the Illinois cases was typified by the second district's opinion in *Estate of Heanue v. Edgcomb*, 355 Ill. App. 3d 645 (2005), where the court held that application of section 25 of the Good Samaritan Act turned on whether or not the physician had billed for the emergency services. 2012 IL App (1st) 112321, ¶ 30. However, the appellate court determined that this construction was out of step with what the legislature intended in enacting section 25. The appellate court agreed with *Henslee* that the word "fee" in the statute is ambiguous. *Id.* ¶ 37. It could refer to a patient being billed for a service, but it could also encompass the physician being paid. Because the statute is ambiguous, the appellate court stated that it needed to consider other statutory construction aids to determine the legislature's intent. *Id.* ¶¶ 36, 41. The appellate court considered the legislative history of section 25, the statement of legislative policy provided by the legislature in section 2 of the Act, and the consequences of construing the statute one way or the other. The appellate court ultimately concluded, as had *Henslee*, that the purpose of the Act is to promote volunteerism and that section 25 was never meant to apply to a physician who responds to an emergency because he or she is paid to do so. *Id.* ¶ 50. The court remanded to the trial court to consider Dr. Murphy's alternative argument that he was entitled to summary judgment because he had not deviated from the standard of care. *Id.* ¶ 54.

¶ 20    This court allowed defendants' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). Additionally, this court allowed the American Association for Justice to file an *amicus curiae* brief in support of plaintiffs' position. The Association contends that, until the appellate court's decision in the present case, Illinois's construction of its Good Samaritan statute was out of step with the way similar statutes are construed in other states.

¶ 21                                        ANALYSIS

¶ 22    This appeal arises from an order granting summary judgment to defendants. Summary judgment is proper when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). This court reviews summary judgment orders *de novo*. *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 399-400 (2010). Additionally, resolving the issue before the court requires us to construe section 25 of the Act, and issues of statutory construction are also reviewed *de novo*. *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234, ¶ 18.

¶ 23    Resolving the issue on appeal requires us to consider two different lines of authority interpreting section 25 of the Act. Defendants contend that the trial court properly granted them summary judgment under the law as it has always existed in Illinois. According to defendants, the correct interpretation of section 25 is found in such cases as *Heanue* and *Neal v. Yang*, 352 Ill. App. 3d 820 (2004). Under this interpretation, the word "fee" in the statute is unambiguous, and a physician is entitled to claim immunity for negligently performing emergency services so long as he or she does not bill the patient, and the decision not to bill is made in good faith. By contrast, plaintiffs contend that the correct interpretation of section 25 is that set forth by the appellate court below and by the federal district court in *Henslee*. Under this view, "fee" is ambiguous and can refer either to a patient being billed or a physician being paid. Courts adopting this view have looked at other aids for construction to determine legislative intent, and have concluded that the Act was meant to apply only to those who volunteer their services.

¶ 24    The issue is thus one of statutory construction, and the principles guiding our review are familiar. The primary goal of statutory construction, to which all other rules are subordinate, is to ascertain and give effect to the intention of the legislature. *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 48. The best indication of legislative intent is the statutory language, which must be given its plain and ordinary meaning. *Metropolitan Life*, 2013 IL 114234, ¶ 18. It is improper for a court to depart from the plain statutory language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *Id*. Words and phrases should not be viewed in isolation, but should be considered in light of other relevant provisions of the statute. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 320 (2003). Further, each word, clause and sentence of a statute must be given a reasonable construction, if possible, and should not be rendered superfluous. *Prazen v. Shoop*, 2013 IL 115035, ¶ 21. Where statutory language is clear and unambiguous, it will be given effect without resort to other aids of construction. *Kunkel v. Walton*, 179 Ill. 2d 519, 534 (1997). However, if the meaning of an enactment is unclear from the statutory language itself, the court may look beyond the language employed and consider the purpose behind the law and the evils the law was designed to remedy, as well as other sources such as legislative history. *Gruszeczka v. Illinois Workers' Compensation Comm'n*, 2013 IL 114212, ¶ 12. A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses. *Id*. ¶ 16. In determining legislative intent, we may also consider the consequences that would result from construing the statute one way or the other, and, in doing so, we presume that the legislature did not intend absurd, inconvenient, or unjust consequences. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 441 (2010).

¶ 25    The predecessor statute to section 25 was section 2a of the Medical Practice Act. Ill. Rev. Stat. 1965, ch. 91, ¶ 2a. As originally enacted, the statute had a much narrower focus:

> "Any person licensed pursuant to this Act or any person licensed to practice the treatment of human ailments in any other state or territory of the United States, except a person licensed to practice midwifery, who in good faith provides emergency care without fee at the scene of a motor vehicle accident or in case of nuclear attack shall not, as a result of his acts or omissions, except wilful or wanton misconduct on the part of such person, in providing such care, be liable for civil damages." *Id*.

The statute underwent various amendments, and the legislature gradually broadened its scope. First, the legislature removed the words "motor vehicle," thus broadening the statute to apply

at the scene of any accident. Pub. Act 76-1205 (eff. Sept. 11, 1969) (amending Ill. Rev. Stat. 1967, ch. 91, ¶ 21). The legislature later removed the phrase "victim of an accident at the scene of an accident or in case of nuclear attack" and simply replaced it with "person." See Pub. Act 78-385 (eff. Aug. 23, 1973) (amending Ill. Rev. Stat. 1971, ch. 91, ¶ 2a). At the same time, the legislature added in the requirement that, for the statute to apply, the physician must not have "prior notice of the illness or injury." *Id*. In 1996, the legislature enacted the Good Samaritan Act, and the exemption that was originally provided for in section 2a of the Medical Practice Act became section 25 of the Good Samaritan Act. See 745 ILCS 49/25 (West 1996). Finally, the statute was amended in 1998 to eliminate the requirement that the physician must not have had prior notice of the injury.[1] Pub. Act 90-742, § 40 (eff. Aug. 13, 1998). Thus, as currently enacted, the statute provides immunity when a physician in good faith renders emergency care without fee. However, there is now a division in the case law over what it means to render care "without fee."

¶ 26    This court has not previously spoken on the scope of section 25. The appellate court, however, has considered several section 25 cases. In *Johnson v. Matviuw*, 176 Ill. App. 3d 907 (1988), the court held that a physician who responded to a Code Blue at a nurse's request could claim immunity under the Act because the patient had not been billed for the physician's services. The court found that the record was unclear as to whether or not the physician had a preexisting duty to respond, but found this fact to be irrelevant. The court also did not consider it relevant that the emergency took place in a hospital setting. Rather, the court held that all that mattered for application of the statute was that the physician had responded to an emergency of which he or she had no prior notice and had not charged a fee. *Johnson*, 176 Ill. App. 3d at 916-18. Subsequent decisions would continue to apply the Act to physicians who responded to emergencies in hospitals or medical centers. See, *e.g.*, *Neal*, 352 Ill. App. 3d 820 (anesthesiologist immune for alleged negligence during emergency delivery when she had no prior notice and did not charge a fee; court holds it irrelevant that she had a preexisting duty to treat plaintiff under her employment contract with hospital); *Blanchard v. Murray*, 331 Ill. App. 3d 961 (2002) (reversing summary judgment on basis that physician had prior notice of the emergency before going to hospital, but concluding that the statute otherwise would have provided immunity because no fee was charged); *Rivera v. Arana*, 322 Ill. App. 3d 641 (2001) (Act applied to physician who rendered emergency care in a medical center because no bill was sent for the services); *Roberts v. Myers*, 210 Ill. App. 3d 408 (1991) (physician who was not patient's regular doctor immune from negligence claim involving emergency prenatal care and delivery because he had no prior notice of the illness or injury, responded to an emergency, and did not receive a fee for his services).

¶ 27    Originally, the courts were not willing to look into the reasons why a fee was not charged. For instance, in *Villamil v. Benages*, 257 Ill. App. 3d 81 (1993), a physician who was at the hospital delivered a baby in an emergency situation when the patient's regular obstetrician did not respond to the call. *Id*. at 85. The patient sued the physician for malpractice, alleging that

---

[1]At oral argument, defense counsel treated the "without prior notice" requirement that previously existed as synonymous with a requirement that the physician must not have had a preexisting duty to act. These are clearly not the same thing, as the facts of this case demonstrate. Dr. Murray did not have prior notice of Anderson's emergency, but he had a duty to respond to such emergencies. See also *Neal*, 352 Ill. App. 3d at 830 (finding physician had preexisting duty to respond to the emergency but no prior notice of the emergency).

his negligence in the delivery had caused the baby's death. The plaintiff testified that she had received a cover letter requesting her public aid card so that public aid could be billed for the delivery. *Id.* at 89. However, neither public aid nor the plaintiff was ever actually billed for the delivery. Thus, the court held that the physician was immune. The court considered the request for the plaintiff's public aid number to be irrelevant because, even if it showed an intent to bill, the controlling fact was that no bill was ever sent. *Id.* at 92.

¶ 28    Later, in *Heanue*, the appellate court would hold, for the first time, that the decision not to bill must be made in good faith for the Act to apply. In *Heanue*, the patient underwent an elective IJ dialysis catheter insertion and was then taken to the recovery room at Swedish American Hospital. Dr. Mark Whitman performed the procedure. A nurse later observed that the medication was not working and attempted to page Dr. Whitman. She could not get in touch with him, and Rockford Surgical Service sent Dr. Edgcomb, who was a partner of Dr. Whitman. Dr. Edgcomb took over the patient's treatment. The plaintiffs brought a negligence action against Dr. Edgcomb, and he moved to dismiss, asserting immunity under the Act. The trial court granted the defendant's motion. *Heanue*, 355 Ill. App. 3d at 646-47.

¶ 29    On appeal, the court first held that the existence of a preexisting duty to treat the patient was not fatal to a physician's claim of immunity under the Act. *Id.* at 648. However, the court held that a preexisting duty could be relevant to whether a decision not to bill was in good faith. *Id.* at 650. The court rejected the plaintiffs' argument that Dr. Edgcomb could not seek immunity under the Act because he received an economic benefit from his relationship with Rockford Surgical. Rather, the court held that the word "fee" in the Act has a set, narrow meaning: "a fee is generated by and tied to the service performed." *Id.* at 649. Thus, because the patient was not billed for Dr. Edgcomb's services, his treatment of her was without fee. However, the court held that previous Illinois decisions had failed to recognize that the term "good faith" in the statute modifies both "provides emergency care" and "without fee." *Id.* at 650. Thus, a physician who did not bill a patient simply to obtain immunity under the Act would not be acting in good faith. The court explained that it is at this part of the analysis that the preexisting duty issue might be relevant: if a physician has a preexisting duty to treat, and he or she ordinarily would bill for such services, then an inference may arise that the decision not to bill was not in good faith. *Id.* at 650-51. The court held that, on the record before it, there was an inference that the decision not to bill might not have been in good faith, because the patient was billed for treatment prior to and following the emergency on the same day. Thus, the court reversed and remanded for a determination of whether defendant's decision not to charge a fee was in good faith. *Id.* at 651.

¶ 30    Thus, the law in Illinois at the time the federal district court issued its opinion in *Henslee* was that a physician would be immune under the Act if he or she, in good faith, provided emergency treatment and did not bill the plaintiff for his or her services. A preexisting duty to treat the plaintiff would not prevent application of the Act, and it did not matter if the physician received any sort of economic benefit or compensation for his time, assuming that he or she did not did not specifically bill the patient for the treatment he or she provided.

¶ 31    In *Henslee*, the court surveyed Illinois law and concluded that the Illinois decisions had strayed far from what the legislature intended in enacting the Good Samaritan Act. In that case, Dr. Drubka worked at Provena Immediate Care Center. He was employed and compensated by Midwest Emergency Associates (MEA), which had a contract with Provena St. Joseph's Hospital to provide physicians for the Care Center and the emergency room. Dr. Drubka was

paid on a *per diem* basis. He did not account for his time other than signing in an out of the care center, and he did not bill patients directly. MEA also did not bill patients directly, but rather billed the hospital for their physicians' time. Provena was responsible for billing patients seen at the Care Center. Dr. Drubka was sued for his alleged negligent treatment of a patient who had a peanut allergy and had experienced an anaphylactic reaction from eating Chinese food. The patient was never billed for Dr. Drubka's treatment at the Care Center, although she was billed for care she received after being transferred to Provena St. Joseph Hospital. Although the patient was never billed for Dr. Drubka's treatment, Dr. Drubka was paid for working at the Care Center on the date in question. *Henslee*, 373 F. Supp. 2d at 804-05.

¶ 32    The plaintiffs brought suit in federal district court, because their suit included a claim that the defendants had violated the Emergency Medical Treatment and Labor Act (42 U.S.C. §§ 1395 *et seq.*). *Henslee*, 373 F. Supp. 2d at 805. Dr. Drubka moved for summary judgment on the state law negligence claim, arguing that he was immune under section 25 because the patient had not been billed for his treatment. The court denied the motion. The court noted that, as the Illinois Supreme Court had never interpreted section 25, its task was to resolve the state law question as it thought that this court would. *Id*. at 807 (citing *United States v. Navistar International Transportation Corp.*, 152 F.3d 702, 713 (7th Cir. 1998)). The court ultimately concluded that this court would not follow the Illinois Appellate Court's construction of the statute.

¶ 33    The court began by noting the narrow focus of the statute when it was originally enacted. As the court explained, the Act was originally designed to "encourage physicians fearful of malpractice suits to stop and render aid to those injured in automobile accidents." *Henslee*, 373 F. Supp. 2d at 807. The court further noted that the legislature had included a statement of legislative purpose in the statute that showed that the intent of the Act was to encourage people to volunteer their time and talents to help others (see 745 ILCS 49/2 (West 2010)) and that the available legislative history also showed that the legislature's intent was to promote volunteerism. *Henslee*, 373 F. Supp. 2d at 808. The court then reviewed the Illinois Appellate Court cases construing section 25 and determined that, despite the legislature's clear intent in enacting the statute, the Illinois courts had used the statute almost exclusively to immunize doctors who provide emergency care in hospitals. *Id*. at 808-09.

¶ 34    *Henslee* determined that the Illinois appellate cases had gone astray in determining that the phrase "without fee" in the statute was clear and unambiguous. Because the courts in those cases saw no ambiguity in the statute, they did not consider any statutory construction aids. *Id*. at 812. Although the term is undefined in the statute, the Illinois courts had determined that the word "fee" "means only a situation where a patient is billed for the specific services the doctor provides." *Id*. at 809. The court noted that the definition of "fee" is simply a " 'charge for labor or services, esp. professional services.' " *Id*. at 812 (quoting Black's Law Dictionary 629 (7th ed. 1999)). The court found that the Illinois appellate court decisions had too narrowly considered only one side of a typical fee situation—the client being billed. However, the court found that a typical fee transaction implicitly includes two steps: a party being billed and a professional being paid. *Henslee* found that the term "fee" is broad enough to include either a doctor being paid for his services or a client paying a bill for the services. The court noted that, under this definition, a "fee" would exist when "a doctor is paid for the emergency services he renders." *Id*.

¶ 35    Because it found the phrase "without fee" ambiguous, the court found it necessary to consider other statutory construction aids to determine the legislature's intent. Once it did so, the court found it clear that a broader definition of "fee" than that adopted by the Illinois Appellate Court would better effectuate the legislature's intent. The court found it beyond dispute that the legislature's intent was to encourage and promote volunteerism, and a doctor who is paid for his services is not acting as a volunteer. The appellate court's interpretation would thwart this clear legislative intent. *Id*. at 812-13. The court thus determined that Dr. Drubka could not claim immunity under the Act because he was paid for his time at the Care Center and simply responded to the emergency as part of his job. The court also determined that a broader definition of the word "fee" was necessary in light of modern billing practices: "because most doctors are no longer compensated directly by their patients, and thus it is difficult to link a charge for services and the eventual payment, a definition of 'fee' should include both the doctor's compensation and the patient's eventual payment." *Id*. at 814.

¶ 36    Finally, the court determined that public policy considerations supported a broader meaning of the word "fee." The court was concerned that physicians could engineer immunity by declining to bill for the specific service provided. The court noted that *Heanue* had addressed this problem by determining that the decision not to bill had to be made in good faith and not for the purpose of avoiding liability. However, the court did not consider that solution adequate to protect patients: "shifting the burden onto the plaintiff to prove the reasons why a hospital did or did not bill for specific services creates an unnecessary level of complex proof." *Id*. The court was also concerned that the appellate court's one-sided definition of "fee" could set up an inequitable situation where the Act would apply differently to those without means. A person who had private insurance and was billed for a doctor's emergency treatment would be able to sue the doctor for negligent care. If the same doctor treated a poor person without insurance, the same doctor could be shielded from his negligence. *Id*. at 814-15.

¶ 37    A later federal district court opinion, *Rodas v. SwedishAmerican Health System Corp.*, 594 F. Supp. 2d 1033 (N.D. Ill. 2009), would disagree with *Henslee*. *Rodas* concluded that, if asked to resolve the issue, this court would follow the long line of Illinois Appellate Court cases rather than rejecting them. *Id*. at 1041. Thus, *Rodas* granted summary judgment to two physicians, Dr. Seidlin and Dr. Soleanicov, who had provided emergency care to the patient during a delivery. Summary judgment was proper because "neither doctor billed plaintiff for their services rendered or received an economic benefit that was derived directly from the services performed." *Id*.

¶ 38    The Seventh Circuit, however, reversed the summary judgments for both doctors. *Rodas v. Seidlin*, 656 F.3d 610 (7th Cir. 2011). The court concluded that, based on the facts before it, it was not required to resolve the conflict between *Heanue* and *Henslee* over whether receiving compensation for medical services was itself sufficient to put one outside the reach of the Good Samaritan statute. *Id*. at 628 n.4. The court believed that the defendants were reading *Heanue* too narrowly, and it determined that even *Heanue* would have mandated that the summary judgments be reversed. *Id*. at 626-28. With respect to Dr. Seidlin, the court concluded that material questions of fact existed as to whether the decision not to bill was made in good faith. *Id*. at 629. With respect to Dr. Soleanicov, the court found it irrelevant that the patient was not directly billed for her services. Dr. Soleanicov was paid a salary by University of Illinois College of Medicine at Rockford (UIC). The patient had been receiving her prenatal care from Crusader Central Clinic Association. *Id*. at 612. Crusader Clinic had an Agreement for

Professional Services with UIC whereby UIC obstetricians and gynecologists would provide back-up professional services to Crusader Clinic patients who were admitted for treatment at local hospitals. Under the agreement, Crusader Clinic would pay UIC a fixed *amount* each year, and Crusader Clinic reserved the right to bill its patients after receiving documentation of services rendered from the UIC physician. *Id.* at 613; *Rodas*, 594 F. Supp. 2d at 1036. In this case, Dr. Soleanicov had submitted documentation to Crusader Clinic of the services she had provided to the patient. *Rodas*, 656 F.3d at 613. Crusader Clinic ultimately billed Medicaid for the delivery. Medicaid wrote off part of the amount and paid Crusader Clinic the remaining balance. *Rodas*, 594 F. Supp. 2d at 1037. The plaintiff was never billed directly from UIC or any of the physicians. *Id.* Seidlin and Soleanicov were paid their normal salary for the date in question, and neither received any additional compensation from the amount billed to Medicaid. *Id.* at 1037-38. Because Soleanicov submitted a billing form to Crusader Clinic, there was "no serious question that she charged a fee for her emergency services." *Rodas*, 656 F.3d at 629. The court elaborated:

> "We see no evidence that the legislature, with its use of the unassuming word 'fee' intended anything to turn on how a fee is processed or the compensation structures of the physicians who provide treatment. For good reason. The moment the General Assembly makes the coverage of the Good Samaritan Act turn on the business model used to collect physicians' fees is the moment every medical practice restructures so that every doctor can be a good Samaritan. That outcome would do nothing to advance the enacted purpose of the Good Samaritan Act, which is to promote volunteerism and shield from liability 'the generous and compassionate acts' of Illinois citizens. 745 ILCS 49/2." *Id.* at 628.

¶ 39    Having considered all of the above authority, we must agree with *Henslee* that the term "fee" is ambiguous. We agree with that court that previous Illinois Appellate Court cases simply assumed that the term was unambiguous and gave it its narrowest possible definition. This resulted in a line of cases that thwarted unmistakably obvious legislative intent. As *Henslee* correctly pointed out, the term "fee" is broad enough to include both a patient being billed and a doctor being paid. The term "fee" is variously defined as "compensation *often* in the form of a fixed charge for professional service" (emphasis added) (Webster's Third New International Dictionary 833 (2002)); "[a] charge for labor or services, esp. professional services" (Black's Law Dictionary 647 (8th ed. 2004)); "[a] recompense for an official or professional service or a charge or emolument or compensation for a particular act or service. A fixed charge or perquisite charged as recompense for labor; reward, *compensation, or wage given to a person for performance of services or something done or to be done*" (emphasis added) (Black's Law Dictionary 553 (5th ed. 1979)); "payment asked *or* given for professional services" (emphasis added) (Webster's New World Dictionary 512 (2d coll. ed. 1986)); "a charge *or* payment for services" (emphasis added) (The Random House Dictionary of the English Language 521 (1983)). One can find dictionary definitions to support either the definition adopted by the previous appellate court decisions or by *Henslee* and the appellate court below. The existence of these different dictionary definitions, each which would make sense in the statute, indicates that the term is ambiguous. See *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 11 (2009). The term is clearly capable of being understood by reasonable persons in more than one way.

¶ 40    Thus, we find it necessary to turn to other statutory construction aids to determine the legislature's intent in enacting the statute. First, we note that the legislature chose the title "Good Samaritan Act" for the statute. While a statute's title cannot be used to limit the plain meaning of statutory text, it can provide guidance in resolving statutory ambiguities. *Alvarez v. Pappas*, 229 Ill. 2d 217, 230-31 (2008). As Webster's explains, the term "Good Samaritan" derives from the biblical parable found at Luke 10:30-37, and refers to "one who compassionately renders personal assistance to the unfortunate." Webster's Third New International Dictionary 979 (2002); see also The Random House Dictionary of the English Language 609 (1983) (defining "good Samaritan" as "a person who *gratuitously* gives help or sympathy to those in distress" (emphasis added)). Moreover, a "good Samaritan law" has a commonly understood meaning in the law. See Black's Law Dictionary 715 (8th ed. 2004) (explaining that a "good-samaritan law" is a "statute that exempts from liability a person (*such as an off-duty physician*) who *voluntarily* renders aid to another in imminent danger but negligently causes injury while rendering the aid" (emphases added)).

¶ 41    Second, the legislature left no doubt that it intended the commonly understood meaning of "good Samaritan law" when it enacted the "Good Samaritan Act." In the Act, the legislature codified a statement of legislative purpose to make its intentions clear:

> "§ 2. Legislative purpose. The General Assembly has established numerous protections for the generous and compassionate acts of its citizens who *volunteer* their time and talents to help others. These protections or good samaritan provisions have been codified in many Acts of the Illinois Compiled Statutes. This Act recodifies existing good samaritan provisions. Further, without limitation the provisions of this Act shall be liberally construed to encourage persons to *volunteer* their time and talents." (Emphases added.) 745 ILCS 49/2 (West 2010).

¶ 42    Third, during the legislative debates on the various amendments to the statute, the legislators who spoke out about the statute's purpose clearly indicated that its purpose is to promote volunteerism. In the legislative debates on Public Act 78-385 (eff. Aug. 28, 1973), which added the "prior notice" requirement to the statute, Senator Schaffer explained:

> "This bill only gives a doctor a safeguard that [*sic*] if he comes upon an emergency situation if one of us falls down the stairs and rolls to the foot of the stairs here and a doctor treats us, and this is on the spot, *not in his doctor's office or in the hospital on the operating table*, that he has a little protection that if we have bad effects because he wasn't able to do the things he might do in a hospital, he would be somewhat protected." (Emphasis added.) 78th Ill. Gen. Assem., Senate Proceedings, May 22, 1973, at 49-50 (statements of Senator Schaffer).

¶ 43    When the legislature enacted Public Act 90-742, which removed the "prior notice" requirement, Representative Lang asked Representative Winters whether it was his position that " 'the passage of th[e] [Act] would encourage good samaritans to do the right thing *on the streets of Illinois*, I suppose, without fear of repercussions in a court of law.' " Representative Winters responded, " '[t]hat is exactly the point of the Bill. To make it patently obvious to anyone that this state does encourage *voluntary* action that professionals who do that kind of action, will not have repercussions against them for their *voluntary* action.' " (Emphases added.) 89th Ill. Gen. Assem., House Proceedings, Mar. 25, 1996, at 100 (statements of Representatives Lang and Winters).

¶ 44 This same exchange between Representatives Lang and Winters also shows that the legislature intended a broad and flexible definition of the word "fee":

> "Lang: 'Just to clarify this. It only covers services that are rendered *without compensation*. Is this correct?'
>
> \*\*\*
>
> Winters: 'That is correct. If a person is serving under … you know, *for pay in his line of duty*, this Good Samaritan Bill would not affect that. He would still be liable for lawsuits. It's only where there is *no compensation*.' " (Emphases added.) 89th Ill. Gen. Assem., House Proceedings, Mar. 25, 1996, at 100-01 (statements of Representatives Lang and Winters).

¶ 45 Fourth, as persuasively argued by the California Court of Appeals in *Colby v. Schwartz*, 144 Cal. Rptr. 624 (Cal. Ct. App. 1978), physicians who respond to emergencies because they are paid to do so do not need the incentive to act that is at the very heart of Good Samaritan statutes. In that case, several physicians responded to an emergency in a hospital because they were serving on the hospital's emergency call surgical panel. *Id*. at 626. When they were sued for negligence, they claimed immunity under California's Good Samaritan statutes, which were similar to the Illinois statute, but did not say anything about compensation. The court explained that the purpose of Good Samaritan statutes is to encourage people to act when they otherwise have no duty to do so:

> "Sections 2144 and 2144.5 were enacted to aid the class of individuals though requiring immediate medical care were not receiving it. Typically, it was the roadside accident victim who, as a result of the strictures of the common law malpractice doctrines, was left uncared for. However, hospital patients, such as the decedent have historically enjoyed the benefits of full medical attention. There is no need for special legislation to encourage physicians to treat this class of individuals.
>
> On the other side of the doctor-patient equation, sections 2144 and 2144.5 were not directed towards the class of physicians of which defendants are members. Physicians, like defendants, who treat patients requiring immediate medical care as part of their normal course of practice do not need the added inducement that immunity from civil liability would provide. Moreover, excusing such physicians of their negligence could have the adverse effect of lowering the quality of their medical care without justification. And further, to extend immunity to such physicians would deny an overly broad spectrum of malpractice victims of their legal remedies." *Id*. at 628; see also *Clayton v. Kelly*, 357 S.E.2d 865, 868 (Ga. App. 1987) (explaining that, if a doctor responds to an emergency because his employment requires him to do so, then he does not need a special inducement to offer aid).

¶ 46 Fifth, *Colby* also recognized that immunity is important in this volunteer setting because the physician will likely be acting without the necessary equipment and facilities, and might be acting outside of his area of expertise:

> "These sections were directed towards physicians who, by chance and on an irregular basis, come upon or are called to render emergency medical care. Often, under these circumstances, the medical needs of the individual would not be matched by the expertise of the physician and facilities could be severely limited. The general practitioner might well find himself treating an individual for needs outside his training

or the specialist forced to practice in an unrelated speciality. However, in the instant case, defendants in performing the exploratory surgical procedure were practicing within their area of expertise and with all of the benefits of full hospital facilities. It is therefore not unreasonable to hold them to the level of skill and training required under such circumstances." *Colby*, 144 Cal. Rptr. at 628.

¶ 47    Sixth, in determining legislative intent, we will consider the consequences of construing the statute one way or another, and we will presume that the legislature did not presume absurd, unjust, or inconvenient results. *Solon*, 236 Ill. 2d at 441. Here, those considerations clearly support a broad, flexible reading of the word "fee." As detailed above, the broader definition of "fee" first adopted by the *Henslee* court will effectuate the legislature's clear intent. Under this definition, volunteerism is promoted. By contrast, the narrow definition previously adopted by the appellate court thwarts legislative intent. Rather than promoting volunteerism, that interpretation simply promotes immunity for doctors who do not bill. But the appellate court has never explained why the legislature would intend such a thing, and has never attempted to justify its interpretation from a policy standpoint. In fact, the appellate court has previously acknowledged that its interpretation of section 25 is contrary to the statement of legislative purpose. See, *e.g.*, *Neal*, 352 Ill. App. 3d at 826. This was a result of the appellate court assuming that the statute is clear and unambiguous. See *id*.

¶ 48    Another consequence of employing the narrow interpretation of "fee" is that an unfair system could emerge in which the wealthy had a greater access to justice than the poor. As the appellate court noted below:

> "*Heanue*'s one-sided definition of 'fee' could result in a disparity of legal remedies between the affluent and the less-privileged. See Ben Bridges, Comments, *Curb Your Immunity: The Improper Expansion of Good Samaritan Protection in Illinois*, 34 S. Ill. U. L.J. 373, 391 (2010). If a hospital physician paid by the hour negligently provided emergency care to an affluent patient and the patient or the patient's insurer was billed for that care, the doctor would not be immune under the Act. Bridges, *supra*, at 391. If the same doctor provided negligent emergency care to an indigent uninsured patient and the hospital did not bill the patient because it would not be able to collect payment, the doctor would be immune under the Act. Bridges, *supra*, at 391. The affluent patient would be able to file a negligence action against the physician and the indigent patient would not. Bridges, *supra*, at 391. The physician could arguably provide substandard care to all poor, uninsured patients because those patients would have no legal recourse against him. Bridges, *supra*, at 391. The legislature cannot have intended such a result." 2012 IL App (1st) 112321, ¶ 47.

¶ 49    And finally, as *Henslee* pointed out, giving "fee" its narrowest possible definition makes the statute difficult to apply, given the modern realities of billing for medical services:

> "[B]illing for medical services is no longer a simple transaction between two parties. Before the days of private health insurance, physician's groups, and Medicaid, doctors used to bill patients directly for their services; in return, the patient would pay the doctor directly. Charging for medical services is no longer so simple. For example, in this case, Dr. Drubka worked for MEA, which had a contract with Provena Saint Joseph's Hospital to provide physicians for both the hospital emergency room and the Care Center. The doctors never billed the patients directly; neither, for that matter, did MEA. Instead, the hospital billing department was the unit responsible for charging

- 15 -

Johnson for Dr. Drubka's services. Had the hospital billed Johnson for Dr. Drubka's services, it would have had to send a bill to Johnson specifying the doctor's individual services and then most likely attempt to collect money from Johnson's insurance carriers. Paying Dr. Drubka a *per diem* fee for his services was a system most likely constructed by the hospital to deal with the realities of the new generation of health care in this country." *Henslee*, 373 F. Supp. 2d at 813-14.

*Henslee* thus concluded that "fee" should be given a broader reading than that previously adopted by the Illinois Appellate Court, because "it is difficult to link a charge for services and the eventual payment." *Id*. at 814.

¶ 50    Considering all of the above, we agree with the appellate court below that "fee" must be given a broader definition than that employed by the earlier appellate court decisions. The phrase "without fee" is ambiguous, and giving it a construction that includes a doctor's compensation will ensure that the legislature's intent is effectuated rather than thwarted. We agree with the appellate court's conclusion that Dr. Murphy did not provide his services to Anderson "without fee." He was fully compensated for his time that day, and it is clear that he responded to the emergency not because he was volunteering to help but because it was his job to do so. Dr. Murphy testified that it was his responsibility to respond to Code Blues. Moreover, it is clear from both the agreement that ECHO had with the hospital and the agreement that ECHO had with Dr. Murphy that ECHO physicians were required to comply with hospital policies, and the hospital's written policy made clear that emergency room physicians were to respond to Code Blues. The agreement between Dr. Murphy and ECHO also specifically addresses physicians responding to emergencies outside the emergency room. In his brief before this court, Dr. Murphy made a very short argument that he was a volunteer. However, at oral argument his attorney conceded that Dr. Murphy was not a volunteer in this situation and that he could not ignore a Code Blue if he was available. The evidence marshaled for and against the summary judgment motion supports no conclusion other than that Dr. Murphy responded to the Code Blue because it was his job to do so. The legislature never intended that Good Samaritan immunity would be available in this situation.

¶ 51                                          CONCLUSION

¶ 52    We thus conclude that Dr. Murphy did not provide his services "without fee," and he may not claim immunity under the Good Samaritan Act. We therefore affirm the decision of the appellate court, which reversed the summary judgment in favor of Dr. Murphy and remanded for a determination of Dr. Murphy's alternative argument in support of summary judgment.

¶ 53    Affirmed.